UNITED STATES of America,
Appellee,

v.

William Van Voast WARREN, Jr., a/k/a George E. Parker, Defendant-Appellant.

No. 1021, Docket 71-1261.

United States Court of Appeals,
Second Circuit.

Argued June 29, 1971.

Decided Aug. 27, 1971.

Bruno Schachner, New York City, for defendant-appellant.

Richard J. Davis, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Walter M. Phillips, Jr., Asst. U. S. Atty., New York City, on the brief), for appellee.

Before MOORE, FEINBERG and MANSFIELD, Circuit Judges.

MOORE, Circuit Judge:

The defendant, William Van Voast Warren, Jr., appeals from a conviction by a jury of the crime of having transported in interstate commerce four paintings and pictures, knowing them to have been stolen. The first four counts related to the separate paintings and pictures, Count 1 (a Renoir), Count 2 (a Gauguin), Count 3 (a Picasso), Count 4 (a Toulouse-Lautrec), Counts 5 and 6 alleging a sale of these items were dismissed by the Court as unsupported by proof.

The facts are not seriously in dispute but must be stated because they supply the background for the defendant's defense of temporary insanity.

The defendant, a graduate of Harvard 1951 (post-graduate courses at M.I.T. and the University of Colorado), married, three children, had been conducting his own business in Denver as a sugar beet by-products broker. He participated actively in civic affairs and was a trustee of the Denver Museum and his own preparatory school in Dublin, New Hampshire.

In 1970 the defendant was interested in promoting a resort venture on a Greek Island. On October 11th he drove to the home of Montgomery H. W. Ritchie to discuss the venture with him. While there he was shown Ritchie's art collection (valued at some $400,000) and learned that Ritchie expected to go to Texas the following day to be absent for a week. On October 13th the defendant went to Chicago for a business appointment, returned to Denver, proceeded to the Ritchie home, wearing gloves broke into the house and stole 16 works of art. Carrying four (the subjects of Counts 1–4) paintings with him, he returned to Chicago and from there went to Boston for a business meeting on October 15th. In Boston the defendant stayed with a friend, Lewis McMillen, who was also interested in the Greek isle project. That day the defendant discussed financial and securities law matters with McMillen and his attorney, Karl Sapers. The next day the defendant went to New York where he registered at the Westbury Hotel under the name of George Parker. He then telephoned the art dealers, Hirschl & Adler, and made an appoint-

ment with Mr. Adler for October 17th for the purpose of selling the Renior and the Gauguin. On October 7th, the defendant, disguised in a toupee and a moustache, kept his appointment and asked $15,000 for the pictures worth some $60,000, provided it be paid in cash.

Mr. Adler's suspicions were aroused and he deferred consummation of the sale until the following Monday, October 19th. The defendant then returned to Boston where he attended a social dinner that night, a business luncheon on Monday, and then returned to New York for his appointment with Mr. Adler at a New York bank. Over the weekend Mr. Adler had confirmed his suspicions that the paintings had been stolen. Upon the defendant's appearance at the bank, he was arrested by agents of the F.B.I. He persisted in maintaining the name of George Parker for several hours but finally admitted that he was William Warren and gave to the F.B.I. a detailed account of his conduct from the time of the theft to the time of his arrest. About the same time the defendant placed a telephone call to his wife during which he said that he had done a "terrible thing."

To support the defense of legal insanity at the time he committed the theft, the defendant established that from the age of seventeen he had suffered severely from asthma. In the five years preceding the theft, he had taken on a physician's advice a drug known as prednisone. The defendant stated that he had been taking on the average 10 milligrams a day. For a short period (April–June 1970) he discontinued prednisone but resumed the daily average of 10 milligrams in July.

To show lack of motive to steal, evidence was introduced that the defendant was the potential beneficiary of funds under various trusts and under a will of substantial sums and had executor's commissions of $10,000 currently available.

The effect of the prednisone on the defendant's mental condition plus the lack of motive to steal formed the basic structure of the defendant's defense.

Appellant as his first point of error asserts that "the prosecutor's summation and the failure of the Court to take corrective action deprived the defendant of a fair trial." More specifically, he charges that "In the course of his summation, the prosecutor gave to the jury a version of the evidence which was directly contradicted by the record." Appellant's Br. p. 18. Additionally, he claims "distortion of the record." These are serious charges which require this Court to examine with particular care the summations and the Court's charge. This the Court has done and finds no basis whatsoever for appellant's assertions.

Appellant set the stage as if the players were only the psychiatric experts. He then quite accurately demonstrated that the background, training and experience of his experts were far superior to the qualifications of the Government expert. Were the case to have been decided solely by appellant's experts, the weight of their writings, their number of patients and their conclusions as to appellant's "fugues," "confabulation" and "disassociated state" would have tilted the scales overwhelmingly in appellant's favor. But the decision was for the jury and there were many other witnesses including the defendant himself. Therefore, the primary appellate question is: what testimony was improperly presented to the jury or excluded or what comments were improperly made by the prosecutor which might have so swayed the jury's verdict as to constitute reversible error?

As an additional ground, appellant's counsel complains of the Court's limitation of summation to 45 minutes for each side. His desire to indulge in "a detailed review of the intricacies of the expert testimony on the issue of defendant's insanity" assumes greater importance in counsel's mind on appeal than

on the trial, because when upon inquiry the Court advised him that he had 20 minutes left, he said that "by now we have heard enough about this case," and in a two minute (approximately) peroration rested his case on his experts' testimony with the very pertinent question: "Can any of you go to sleep with a clear conscience saying the word of the three men is not even worthy of a reasonable doubt?" The next day the jury answered the question. Even now counsel does not reveal what he could have done with his remaining 18 minutes to sway the jury to favor his cause.

### The Summations

Defense counsel naturally stressed the fine family and educational background of the defendant, his respected life in Denver; the large sums of money available to him; his lack of motive to obtain money from stolen pictures; and the effect of a drug (prednisone) taken to relieve the defendant's asthma; which allegedly produced a steroid psychosis, the alleged cause for all of defendant's misdeeds. Most of the summation was devoted to extolling the merits of the defendant's medical experts and minimizing the Government's.

The prosecutor analyzed the uncontested facts of the theft, the defendant's subsequent acts in Boston and New York; the attempted sale; the false name of "George Parker"; the use of a toupee and a moustache as a disguise; and the story in New York to the F.B.I.; and submitted to the jury as argument that each of the defendant's acts was the product of "a rational thought process." He argued that many (to his point of view) essential facts had not been revealed to the psychiatrists and that the defense claim of amnesia was belied by the excellence of the defendant's memory.

The quantity of prednisone taken by the defendant was mentioned—10 milligrams per day according to the defendant. The defense psychiatrists assumed without foundation in the proof that he must have been taking more and this presumption the prosecutor sought to refute from the evidence of quantities purchased.

To minimize the effect of the defense's psychiatric witnesses, the prosecutor, answering defense counsel's rhetorical question "Do they sould like perjurers and crooks to you?", frankly conceded that "We are not saying that the doctors perjured themselves or are criminals, as Mr. Schachner characterized them." However, the prosecutor left with the jury the thought that, after the defendant had been caught, the best way for him to get out of his predicament was to hire the best scientists in the country to present their theories that the defendant was "psychotic, lost contact with reality, during this period of time."

### The Charge

The Court instructed the jury clearly and concisely as to their functions in deciding the factual issues and defined the words "unlawfully, wilfully and knowingly" as used in the indictment. Two excerpts suffice.

"The law defines insanity for the purpose of responsibility for criminal conduct as follows:

"A person is not responsible for personal conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

The Court continued:

"On the issue of sanity both sides have called psychiatrists. You are not, however, by any means limited considering this question to the opinions of these doctors. Only you can decide this issue. But you should, of course, give such weight to the opinion of each psychiatrist as you think his opinion merits. You are entitled to take into account, and you should take into account, any other evidence that you believe relates to that issue, including the evidence which you have

previously considered on the issue of whether the defendant's conduct was knowingly [sic] and wilful."

No error can be gleaned from the charge.

■ On appeal appellant's counsel asserts that "in the course of his summation, the prosecutor gave to the jury a version of the evidence which was directly contradicted by the record."

We are not persuaded that the prosecutor transgressed the bounds of permissible argument. The prosecutor presented a straightforward and concise statement of the virtually conceded facts as to the defendant's activities from October 11, 1970 (his visit to Mr. Ritchie's ranch) to October 19, 1970 when the defendant was arrested by the F.B.I. He correctly and in advance of the charge stated the applicable standard as "Could he appreciate the criminal nature of his conduct and could he conform it to the standards required by law?" The following statement was excepted to by defense counsel:

"The defense psychiatrist said that he was taking prednisone and that because of this taking of that drug he was suffering from Steroid psychosis. How much was he taking? He was taking ten milligrams per day. They all agreed that this was a normal amount. In fact, the defendant told you that on the witness stand, but they say, the psychiatrists say, he must have been taking more. Why must he have been taking more? Because he did such a thing, that's why. One depends on the other. It does not make sense."

As to the amount of prednisone the defendant was taking, it was the defendant who gave the figure of 10 milligrams per day. Dr. Sacher (defense psychiatrist) gave an affirmative answer to whether this amount "would be enough to cause, in some cases, major psychological side-effects or mental side-effects?" In response to the question of whether this was a normal amount, he testified that it depended on the conditions, and that in his view it was not an appropriate dose for defendant. Dr. Klein (another defense psychiatrist) testified that 10 milligrams a day "is not an abnormally high amount." On the other hand, these defense psychiatrists speculated that the defendant "must have been taking more." On such a record the effect of prednisone, if any, on the defendant was for the jury to determine. Since the defense psychiatrists chose to proceed with a *post hoc propter hoc* speculation, the prosecutor was entitled to comment on it. Furthermore, the jury might well have considered that the defense psychiatrists had received their factual hypotheses solely from the defendant and his counsel. They had not conferred with or questioned the persons familiar with the defendant's conduct between October 11th and October 19th, namely, Mr. Ritchie (owner of the pictures), Mr. Saper (Boston attorney), Mr. McMillen (Boston architect) and agents of the F.B.I.

■ The many cases cited by appellant dealing with serious distortion of facts by a prosecutor are inapplicable here. It is true that this case presents a bizarre situation. Most crimes do. But here was a highly intelligent and well educated man whose conduct in stealing and trying to sell the pictures was certainly at variance with his past life. Admitting the facts of the theft, his skilled defense counsel chose to rely on the defense of insanity and to prove it called upon three well qualified psychiatrists. The Court gave counsel full opportunity to put their theories of mental disease, confabulation, fugues, and disassociated state to explain the defendant's acts before the jury. They testified as to how it was possible, according to their theories, for the defendant to be seemingly normal on Thursday, Sunday and part of Monday in Boston, discussing financial and other aspects of a Greek isle resort venture, and yet be in an irresponsible disassociated mental state on Friday, Saturday and Monday in his attempt to dispose of the stolen pictures. When probing on cross-exami-

nation into this dual personality possibility, defense counsel when inquiring "It is at least possible, is it not, that a second and new and coherent personality assumed control of Mr. Warren's conduct?" elicited the answer "It is possible" and "anything is possible." The Court then reiterated the obvious that "Anything is possible. I might be disassociated right now sitting here." It was defense counsel who injected the possibility situation by the use of the "is it possible" approach—an approach used countless times in countless cases in the examination of medical experts. While better left unsaid, the Court's remark was not reversible error.

■ It would be pointless to discuss each of the items included under appellant's Point III entitled "The intrusions by the Court into the presentation of the case seriously prejudiced the defendant." Each of the incidents raised by appellant is trivial and distorted as to its consequences. One example suffices. Appellant would make it appear that the Court, in saying "gratuitously," "We have had this witness here *ad nauseam*" was disparaging one of his experts. On the contrary, when looking to the record for the facts, it discloses that the remark was addressed to the prosecutor when urging him to limit re-cross-examination. Furthermore, in a day when the classics have virtually been eliminated from the educational scene, it is doubtful whether the jury was well versed in the Latin language. In any event the defense had been given full opportunity to interrogate its expert witness and can scarcely complain when the Court sought to curtail the prosecutor.

In summary, the record reveals very little participation by the Court in the trial and then only in the interests of clarity. Defense counsel was given the broadest latitude in developing through his expert witnesses their theories as to defendant's experts. The defendant's conduct was bizarre but he chose to avail himself of his constitutional right to present himself to a jury and to pro-

duce witnesses who gave their opinions as to his unusual behavior. The Court's charge accurately stated the law to be applied. On appeal this Court cannot assume the jury's responsibility. They saw and heard the witnesses, including the defendant. They heard, as the Court said in its charge, two "excellent summations." The Court accurately described them. Skillful defense counsel stressed all the salient points made by his experts. The prosecutor stressed the facts. The decision then was for the jury. The discussions in the jury room are no part of the record. We have before us only that which occurred in the court room. That record discloses no reversible error.

Judgment affirmed.