**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**

**v.**

**FRANK DOWNEY, Defendant**

Crim. No. 1974-116

District Court of the Virgin Islands

Div. of St. Thomas and St. John

June 23, 1975

JULIO A. BRADY, ESQ., U.S. Attorney, St. Thomas, V.I., *for plaintiff*

JOHN E. STOUT, ESQ. (GRUNERT, STOUT, HYMES & MAYER), St. Thomas, V.I., *for defendant*

YOUNG, *District Judge*

## MEMORANDUM OPINION AND DECISION

## I

### THE PLEA, TRIAL AND POST TRIAL PROCEEDING

Frank Downey's plea to the charge of first degree murder and to the charge of unlawful possession of a firearm used in the commission of a crime of violence was "not guilty by reason of insanity". At the close of evidence of the two-day trial, without a jury, I indicated to counsel that in lieu of receiving summations and oral argument, I would prefer to have their presentations in the form of simultaneously-filed trial briefs. I felt that I needed more than the usual "bench decision" time and that I also needed the studied help of counsel to assimilate the factual and legal issues involved. Counsel consented, the prosecution waived its normal right to a rebuttal argument, both briefs have been filed, and I have deliberated and have reached a decision. Unlike the return of a jury's verdict, I must support my decision with findings of fact and my legal conclusions.

I find the defendant, as to Count I, guilty of murder in the second degree; and as to Count II, guilty of the unlawful possession of a firearm used in the commission of a crime of violence.

Since a defendant in a criminal case is entitled to be present at all critical stages of the proceedings and since he surely should be among the first to receive the verdict—or, as in this case, the court's decision, I will arrange to have this opinion sealed until June 23, 1975, when I shall be in St. Thomas. I will set a time for defendant, his counsel and the United States Attorney to be present in Court to receive this opinion.

## III(a)

### THE FACTS

Although the facts leading up to, at the time of the killing and immediately thereafter are essentially undisputed, I must set them out in my findings; and I will do so in some detailed fashion inasmuch as all of the circumstances are most important in the consideration of the insanity defense.

At trial, defendant's wife, Charlotte (herein, "Charlotte" or "wife") testified that she had been married to defendant for over thirty-one years (the first and only marriage for both). However, at the time of the killing and for many months prior, they were having marital problems and quarrels. Defendant's sailing companion and fairly close friend testified that during the past few months, he noticed that defendant's performance as a crew on his racing sailboat for the past six months was not up to par, that his reactions were slow, "his mind on something else"—he appeared depressed—"wasn't quite normal." On the night before the fatal shooting, in a driving wind storm

and rain, at 3:30 a.m. (Friday morning) defendant appeared on foot at his friend's house, having walked in the rain, was soaking wet and asked to be driven home, which was done. While driving him home, the friend was told by defendant that defendant's wife was going to leave him and that he contemplated suicide. The witness testified that defendant did appear irrational but not so much that he had cause to be alarmed or to do anything about it. After being driven home, the defendant apparently rested a bit and then walked barefoot back to Avery's (a 3 mile hike) where he met his wife on the boat. Aside from noting his blistered feet, his wife testified to nothing else unusual about his condition or appearance. Between five and seven o'clock on Friday evening, August 30, 1975, she and her husband had cocktails with friends on their sailboat docked at Avery's in "French-town". After having consumed several drinks with his friends, defendant went below rather early to turn in for the night. He was either depressed or angry because his wife did not kiss him goodnight as per their custom. Shortly thereafter, Charlotte left the boat and called a cab from the Quarter-Deck Restaurant to take her home. As the cab arrived at the foot of the dock, so did defendant. He paid the cab driver off, took Charlotte by the arm and said he would drive her home. He drove rather speedily in covering the three miles to their house in Estate Wintberg, but he continued, went past the turnoff and proceeded the next two miles, without conversation or explanation, to the home of Charlotte's paramour, John Matschke (herein, the "victim" or "Matschke"). Matschke welcomed them, but defendant uttered a few unpleasant remarks, left his wife there and drove off. This was at, or after, ten p.m. At about midnight, defendant returned, armed with a military .45 caliber pistol, shot Matschke in the stomach and, as the victim fell to his knees, once more, in the chest, causing his

immediate death. Dr. Bernard Rumsch, the medical examiner, examined the body at 1:30 a.m., and estimated the time of death to be approximately 1 1/2 hours before. After a subsequent autopsy, he gave the cause of death to be shock due to sanguination of the stomach and chest caused by two entry and exit .45 caliber wounds.

The government's case consisted of after-the-fact witnesses who testified to undisputed facts which I accept as part of my findings. The ambulance driver and emergency room nurse at the hospital each testified that, at about 12:30 a.m., defendant's wife came to the hospital requesting medical help for a dying man. Arriving at Matschke's house, the ambulance driver saw defendant sitting outside the house at a table by the swimming pool. Defendant said "No sense. He's already dead."[1] After confirming the fact, by examining the corpse inside the house, the driver then saw that on the table next to defendant there was a .45 caliber pistol (government's Ex. No. 1, stipulated to be the gun from which the fatal bullets were fired). Defendant told his wife: "I did this for you and your son." Defendant then asked his wife for a drink, which she served to him. Patrolman Henry Martin was the first policeman on the scene. On arrival he heard defendant say, "I killed the son-of-a-bitch. Now get him out of here." Defendant related that if he had to do it over again, he would. Later, defendant related how he shot Matschke— first in the stomach, the best place for pain, and then in the chest to finish him off. He admitted to having done a wrong thing, but if he had to do it over again, he would. Patrolman Martin observed defendant having at least three drinks and that he tried to walk away twice, after

---

[1] Without the aid of the reporter's transcript, which has not been ordered, I may not be entirely accurate on this and subsequent quotations of the testimony. I will nonetheless use the quotation device since quotations will, subject perhaps to minor errors, give the gist and tenor of what was actually said better than would any rephrasing.

which Martin handcuffed him to the chair. The emergency room nurse gave defendant a blood-alcohol content test at 3:10. I will discuss her observations of defendant and the test result later.

Detective Noel Martin, the investigating officer, arrived on the scene at 1:35 a.m. He saw the defendant sitting in a chair by the pool and removed the pistol from the table. The defendant told him: "I killed the son-of-a-bitch and he's in there!" Defendant asked his wife for another drink, but Martin cut that off. Martin ordered defendant to be taken to the hospital for his blood-alcohol content. Later, at police headquarters Detective Martin again saw defendant. At 4:55 a.m., when asked if he would waive his right to have a lawyer before making any statement, defendant replied that he did not wish to make any statement and that he did want to see his lawyer. Shortly thereafter, at 5:04 a.m., defendant voluntarily said to Detective Martin: "I shot the son-of-a-bitch, I don't care. We were very good friends. I helped him bury his wife." Later when notified that his wife was calling on the telephone, defendant said : "Tell my wife to drop dead." More of Detective Martin's observations will appear in a subsequent section of this Opinion. The desk sergeant at the police station heard defendant telephone someone for clothing and in this call, defendant stated that he did not want to be bailed out and "I killed that mother-fucker and I'll spend my time in jail."

The foregoing facts are essentially my findings of fact from the evidence adduced at trial. As indicated above, there are a few personal observations made of defendant's behavior and appearance (after the shooting) which I have accepted as undisputed facts and which I will discuss later. At this point, I will digress to mention the defendant's motion for acquittal after the government's case-in-chief.

45

## III(b)

### DEFENDANT'S MOTION FOR ACQUITTAL

 Citing Government of the Virgin Islands v. Bellott, 495 F.2d 1393, 1396 (3rd Cir. 1974), and United States v. Currens, 290 F.2d 751, 761 (3rd Cir. 1961), the defense moved for acquittal on grounds that the Government failed to sustain its burden of proving defendant's sanity beyond a reasonable doubt. It is a well-established maxim that every person is presumed sane, but in a criminal case, where some evidence of insanity has been introduced, or, as the defendant argued in this case, where the issue of insanity was raised in the plea and also by pre-trial orders for psychiatric evaluation of defendant upon motions from both defense and prosecution, the presumption disappears from the case and the burden then is heavy upon the government to prove that the defendant is sane beyond a reasonable doubt. Accepting the teachings of Currens and Bellott, I ruled that the government had, without any need to resort to expert testimony, sustained its burden with considerable lay witness testimony, at least sufficient to withstand a Rule 29(a) motion for judgment of acquittal, and I denied the motion.

## IV

### THE TEST OF INSANITY IN THE VIRGIN ISLANDS

During a pre-trial conference held in this case on the day before trial, counsel for both the Government and defense expressed some concern over which test of insanity was to be applied in the Virgin Islands. Confusion arises from the fact that we have a statute, 14 V.I.C. § 14(4), which essentially adopts the Durham rule (see Durham v. United States, 214 F.2d 862 (D.C. Cir. 1975)), and a decision by the Third Circuit, which accepts a modified version of the Model Penal Code test (see United States v. Currens, 290

46

F.2d 751 (3d Cir. 1961)). 14 V.I.C. § 14(4) provides that:

[a]ll persons are capable of committing crimes or offenses except— . . . persons who are mentally ill and who committed the act charged against them in consequence of such mental illnesses . . . .

Expressing disapproval with the Durham test, and by implication progenical statutes like 14 V.I.C. § 14(4), as stressing, to the exclusion of all other considerations, a possible causal connection between the mental illness and the act committed, the Currens Court approved instead the following formula:

The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated.
Id. at 774.

 Although there is a marked trend in the Circuits away from Durham and toward the adoption of the Model Penal Code formulation (see, e.g., United States v. Brawner, 471 F.2d 969 (D.C. Cir. 1972); United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); United States v. Chandler, 393 F.2d 920 (4th Cir. 1968); United States v. Shapiro, 383 F.2d 680 (7th Cir. 1967)), I see no reason why this Court would be obliged to apply Currens, which involved an insanity defense to a federal crime, in derogation of our legislative enactment in 14 V.I.C. § 14 and in a crime (murder) which is manifestly local in nature.[1a]

In a recent case arising out of a Virgin Islands murder conviction, the Third Circuit in Government of the Virgin Islands v. Bellott, 495 F.2d 1393 (3d Cir. 1974), assumed, albeit in dictum, that the Currens standard would apply.

[1a] Chief Judge Christian is apparently in accord with this view. In his opinion in Government of the Virgin Islands v. Bellott, Crim. No. 4-1971 (D.V.I. filed June 13, 1974), handed down last week in the Division of St. Thomas, he utilizes the statutory standard set forth in the Virgin Islands Code. Slip op. at p. 3.

Id. at 1397. From a reading of Bellott, it is impossible to discern whether the Circuit Court was adequately apprised of the existence of our Virgin Islands incapacity provision. Our legislature has spoken on this matter, and until it promulgates a successor statute which reflects modern trends in the law of insanity, I feel compelled to apply our local codification of the Durham rule. See Government of the Virgin Islands v. Smith, 278 F.2d 169 (3d Cir. 1960); Annot., 1 A.L.R. Fed. 965, 983 (1969).

Parenthetically, I might note that counsel for both parties have agreed that, in light of the theory of insanity based on dissociative reaction, it would make no difference which test was applied in the instant case.

## V

### DISSOCIATION—A MENTAL DISORDER

Dissociation is a major mental disorder in which the personality is very seriously disorganized and contact with reality is usually impaired. There are two sorts of dissociation, viz. functional and organic. Since, in this case, there is no evidence of any pathological defect, such as brain damage, etc., we are concerned only with a functional dissociation, such as, but certainly not limited to, schizophrenia.

The defense theory, propounded by defendant's expert witnesses, Dr. Marvin Isaacson of Miami, Florida, a physician specializing in psychiatry, and Dr. Michael A. Woodbury of Puerto Rico, also a physician specializing in psychiatry, is that at the time of the killing, Frank Downey was in a dissociated state of mind—a temporary mental disorder;[2] that this dissociation was triggered by anxieties which in turn were caused by defendant's failing business, troubles with the Internal Revenue Service and his wife's

---

[2] The term "temporary insanity", according to the psychiatrists testifying, is no longer in favor with the medical profession.

romantic involvement with Matschke, all of which overwhelmed defendant's personality. Dr. Isaacson diagnosed it as a dissociated state with a fugue episode. He believes that defendant had amnesia, that he cannot recall anything from 5:45 p.m. Friday night until the shooting, about 6 1/2 to 7 hours later.[3] The doctor further opined that defendant suffered a hysterical manifestation of assuming another personality. This he said was a neurosis; not a psychosis.

In rebuttal, the Government called Dr. Leighmin Lu, the chief psychiatrist of the mental clinic, Knud Hansen Memorial Hospital, St. Thomas. He essentially agreed with Isaacson's and Woodbury's diagnoses, save for his belief that both the dissociation and the amnesia were caused by the prolonged ingestion of large quantities of alcohol by defendant. All of these psychiatrists agreed that at the time of the act of killing, defendant did not know right from wrong nor was he capable of conforming his conduct to accepted moral and legal standards.

It is well recognized that either a jury or a court sitting without a jury need not determine the issue of sanity in a criminal case from the opinion of experts alone, but rather should decide the cases on all evidence adduced at trial. See United States v. Ross, 468 F.2d 1213, 1215 (9th Cir. 1972). The fact that the Government was incapable of producing at trial expert testimony to substantiate its position of sanity does not ipso facto mean that it has failed to meet its burden. For, it is recognized that it can do so even without using expert testimony on the sanity question. See, e.g., United States v. Shackelford, 494 F.2d 67, 70 (9th Cir. 1974); United States v. McCracken, 488 F.2d 406, 410 (5th Cir. 1974). In addition

---

[3] The amnesia did not, however, include defendant's recollection, while under the influence of sodium amytol, of taking Charlotte to Matschke's house just prior to the shooting.

49

to establishing sanity through the testimony of lay witnesses whose observations of the defendant are proximate in point of time to the homicide, the Government may rebut the opinion evidence introduced by the defense. In Mims v. United States, 375 F.2d 135, (5th Cir. 1967), the Fifth Circuit outlined the techniques by which the Government might meet its burden by discrediting defense experts:

[E]xpert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, "the reasoning by which he progresses from his material to his conclusion," the interest or bias of the expert, inconsistencies or contradictions in his testimony as to the material matters, material variations between the experts themselves, the defendant's lack of cooperation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him.

Id. at 143–44, quoted in United States v. McCracken, 488 F.2d 406, 410 (5th Cir. 1974).

█ For the reasons stated herein, I find the Government has met its burden. As a prefatory note, many aspects of a defense of temporary insanity by dissociation bear the gloss of convenience. Particularly unsettling is the temporary nature of this brand of mental illness. Other than a history of alcoholism, there is no indication in the record that the defendant had ever suffered any mental illness or disease prior to the incident for which he stands charged.[4]

---

[4] By way of contrast only, I refer to the Michael Crowe case recently decided by me without a jury [Government of the Virgin Islands v. Michael Crowe, Cr. No. 27-1968]. Although Crowe had been hospitalized in mental institutions no less than ten times between the years 1960–1975 and had been consistently diagnosed as being a psychotic of the schizophrenic type, complicated by chronic alcoholism, his action in killing the first white man he came across after hearing of the assassination of Martin Luther King

Add to this Dr. Isaacson's conclusion that defendant's dissociative reaction ended seconds after the shooting, and the gloss of convenience begins to take on an even greater luster.

Dr. Isaacson opined that Downey entered a dissociative state about twenty-four hours prior to the shooting and had amnesia for the last seven hours prior to the shooting, which state subsided immediately after the shooting. (But since defendant recalls the details of the shooting, the amnesia and dissociation must have ended concurrently or simultaneously with the shooting.) Dr. Woodbury pinpointed the inception of the dissociative state to be August 29, the day preceding the killing. The incident which triggered defendant's purported dissociation is the focal point of Dr. Woodbury's entire analysis and should be viewed with some brief background information in mind. Charlotte embarked on an affair with Matschke in February, 1974, shortly after the death of Matschke's wife. They spent several nights together between that time and late August, 1974. Although defendant was aware of this relationship, he maintained superficially amiable relations with Matschke. Internally, however, he became more upset, until, according to Dr. Woodbury's theory, on August 24th, while at home, Downey saw his wife's car parked in front of Matschke's house where it remained for several hours. Dr. Woodbury concluded that at this point, defendant entered into a dissociative state. Significantly, this incident, upon which Dr. Woodbury hinges his entire hypothesis, is not even mentioned in Dr. Isaacson's report. Additionally, unlike Dr. Isaacson, Dr. Woodbury believes that the defendant may still be in a dissociative state, although less acute than on the night of Matschke's death.

---

was considered by three eminent psychiatrists (one of whom testified in the case sub judice) to be attributable to a sociopathic personality disorder, which is not considered a mental illness.

51

An important factor in my unwillingness to accept these expert opinions is that Charlotte's infidelity and the concomitant affront to defendant's masculinity (already damaged by business failures), to which Drs. Isaacson and Woodbury attribute the actual triggering of the insanity, also supply a motive for the killing. Indeed, marital infidelity is not new to the law of homicide nor to the Virgin Islands.[5] Not only was Charlotte being unfaithful, but her lover, Matschke, was taunting defendant with that fact. (This was not brought out in evidence, but was part of the facts related by defendant to the psychiatrist in one of the many interviews.) In his report, Dr. Isaacson set forth what he considered to be the "most paramount" consideration in his diagnosis, or "the crux of the matter", which was that in response to pleadings by defendant to Matschke that defendant could not take the pressure of losing his wife, Matschke responded unsympathetically, "I am like you—what I want, I take." Charlotte, too, taunted defendant with similar revelations of her relationship with Matschke, apparently getting even for defendant's own indiscretion of several years back. All this, heaped upon defendant's already damaged ego, or, as the psychiatrist phrased it, his masculinity, provided the requisite motive for defendant to kill Matschke. The killing of Charlotte's lover, however unlawful, cannot be said to be an irrational

---

[5] I now refer to two recent cases in St. Croix, not by way of contrast, but for their similarities to this case. In Government of the Virgin Islands v. Alfredo Evans, Crim. No. 75-15, Evans had known for a long time that his recently estranged wife was having an affair. He also felt the pressure of financial problems. One day he picked up his wife and took her to his house, apparently to argue. When he said, "You should be ashamed of the things you are doing," she replied, "Kiss my ass." At trial, he testified that this triggered him. He "blacked out" and shot her five times, killing her instantly. The psychiatrist who made a psychiatric evaluation of Evans testified that Evans "could have made an irrational response at any time due to the pressures on him."

The second case is that of Government of the Virgin Islands v. Cecilia Rogers, Crim. No. 75-76, wherein Ms. Rogers, upon learning that her supposed "common law" husband and father of her child was getting married, went to the church and shot him several times while he was at the altar waiting for his bride.

decision under the circumstances. Defendant visualized Matschke as the source of his marital difficulties; to eliminate the source was to rid himself of the problem. Such actions are as consistent with traditional concepts of motive as they are with insanity. I cannot accept Dr. Isaacson's conclusory theory expressed at trial that defendant had two choices: (1) losing his mind; or (2) self destruction . . . that after the shooting, defendant was relieved of the pressure and was able to return to reality—the "crisis of self destruction" was removed. I find that he never left reality.

Another aspect of the expert testimony which troubles me is the great reliance by the psychiatrists on defendant's narrative statements to them as to his feelings and subjective impressions at the time of the shooting. Cf. Mims v. United States, supra. at 143–44. To Dr. Isaacson, he relayed purported feelings of "unreality":

> What is significant is that he felt the whole scene to be one of unreality, as if he was set apart from the situation, things were happening but he could not control his actions. It were as if he were seated in the back seat of an automobile at night, someone else is driving, and he is looking from the windshield beyond the headlights. His analogy is: the child breaks through, the child is struck by the car, but you are powerless to stop the killing. He states he experienced very weak emotions, no sensations, but feelings of unreality.

To say the least, these statements and impressions, insofar as they relate to the defense of insanity, are self-serving. Furthermore, the normal means by which the reliability of such statements is tested in a court of law, cross-examination, is not available when introduced in the context of a medical report. Instead, the Court is relegated to accepting the judgment of the expert witness as to the merits of such statements. Unfortunately, the psychiatrist views a patient's impressions from a diagnostic perspec-

53

tive, and the credibility of the patient may not always be a paramount consideration in the mind of the doctor. At trial, it was claimed that the sodium amytol interview was an effective control on the truth or falsity of the defendant's statements; that if the subject were hiding his true impressions, it would be divulged under the influence of the drug. Despite these assurances, I believe that inasmuch as the sodium amytol technique is primarily a means by which "a patient's inhibitory processes are relaxed" and matters suppressed within his mind may be brought into consciousness (see 30 Am. Jur. (Proof of Facts) 320–21), and not an infallible truth-seeking device (United States v. Borum, 464 F.2d 896, 898 (10th Cir. 1972)), I am reluctant to accept the facts brought out in a narcosis examination as a substitute for facts testified to under direct and cross-examination at trial. This is not to say that I am of the opinion that defendant should have testified to lend more credibility by exposure to cross-examination the same facts related by him to the psychiatrists. He has a right not to testify; he has no burden of proof; he need not prove his insanity at the time of the killing. The facts that he related to the psychiatrist from the serenity of the "psychiatrist's couch" are admitted in evidence not to establish the truth thereof; those facts are admitted only to establish the basis—the keel and ribs out of which the psychiatrists have shaped the hull of their diagnoses. Whether that hull is a sound hull of course depends upon the soundness, the credibility of the keel and ribs. Essentially, the acceptability of the three doctors' diagnoses is whether I can accept the same wood and fibers which apparently the doctors accepted in their construction of the hull—their diagnosis of defendant's inner life, the labyrinthine pattern of defendant's complex motivations.

Another salient fact upon which Dr. Isaacson's diagnosis is based is defendant's almost total lack of recollec-

tion of the time sequence from 5:45 p.m. to just before the criminal act in question. Piecing together the facts adduced at trial with the facts divulged by defendant during the course of his psychiatric interviews, I am somewhat suspect of this amnesia. As will be hereinafter discussed, defendant was manifestly aware of the shooting itself, as he related it in rather explicit terms to Patrolman Martin some hours later. Dr. Isaacson's report sets forth the defendant's detailed narrative of the scene itself:

> He states, "the victim was walking toward him, was wearing T shirt and white shorts." Mr. Downey took out his gun, levelled it and shot the man in the abdomen. The victim took a few more steps and then stretched out on his back. He is very careful to describe the details of the scene. He states that his wife started screaming, "it cannot be real." He states that he shot him in the chest, again because of his experience as a deer hunter.

Additionally, Dr. Isaacson notes in his report that during the sodium amytol interview, the defendant recollected, albeit vaguely, driving his wife from the boat to the victim's house that night. The only significant period of time, then, that is unaccounted for is that segment between the time he dropped his wife at Matschke's home and his return with the gun. The record is devoid of any evidence to indicate either the actual length of time that passed between defendant's departure at Matschke's house and his return or where defendant actually went to pick up the murder weapon. It was assumed by Charlotte and Dr. Isaacson at trial that he picked up the gun at his home, but this assumption finds no support in the evidence. If defendant did not go home for the gun but instead had it with him all the time, or if the time span between departure and return to Matschke's home was brief, it is not unlikely that defendant, distraught as he must have been, would not have recollected the details of that time frame. Furthermore, Dr. Isaacson testified at length as to

55

the special care in administering the sodium amytol and in extolling the successful results. He says that it proves that defendant did have a genuine and not a feigned amnesia. Yet he admits that only under sodium amytol did defendant recollect taking Charlotte to Matschke's house just prior to the shooting. Was this not a "slip" on his feigned amnesia, uncovered by the sodium amytol? No, explains the doctor; it is not unusual that some part of the amnestic period will be recalled under sodium amytol and, that at most, it is a sign that it was not an alcoholic induced amnesia.

Finally, and most importantly, I am convinced that the value of the expert testimony is fatally weakened by the failure of the doctors adequately to account in their diagnoses for defendant's alcoholism. Dr. Isaacson testified that he believed that alcohol in no way contributed to defendant's mental condition on the night in question. In his report dated March 14, 1975, Dr. Woodbury diagnosed "a dissociative reaction . . . to which was added an acute episode of alcoholic blackout." Dr. Woodbury backtracked from this position somewhat at trial, stating that the dissociative state and resulting amnesia could have been, but probably was not, caused by alcohol. This modification was attributable, at least partially, to the testimony of one of the police officers at the scene who noted that defendant had about three drinks *following* the shooting. Naturally, these drinks would have been reflected in the blood test subsequently taken at 3:10 a.m. at the Knud Hansen Memorial Hospital. The test indicated an alcoholic content of .26% in defendant's blood stream, which, estimating Downey's body weight to be 150 pounds, would indicate the ingestion of an equivalent of about six two-ounce drinks. Subtracting the three drinks which the officer said that defendant ingested subsequent to the shooting, there

would still have been a level of alcohol in the blood at the time of the act which would constitute drunkenness.

Mrs. Copenny, the emergency room nurse who tested defendant's blood for alcoholic content testified that when defendant was ushered into the emergency room at about 3:10 a.m., he appeared "as a man involved in a traffic accident . . . that he did not act unusual . . . said nothing unusual . . . was not staggering . . . his speech, not slurred . . . alcohol on his breath, but appeared not too intoxicated . . . he was able to give the 'pedigree' information without pause or trouble and to compute his age to date from his birth date." When, in the pedigree questions, he was asked if he was married, he answered "Yes, I'm married. That's why I'm in this mess today." He also related to the nurse a little about the love triangle. As to defendant's physical condition, Detective Martin testified that when he arrived on the scene at about 1:35 a.m., defendant answered all questions routinely. The detective noticed nothing unusual about defendant save for his being without a shirt. He testified that he considered defendant to be intoxicated, but only because of the strong smell of alcohol on his breath, "he was not a staggering drunk . . . his language, not slurred."

It is not unlikely that defendant would have consumed a large amount of alcohol on this particular evening. He was under great strain and had been depressed for a period of months preceding the incident. A physical examination conducted at P. L. Dodge Memorial Hospital in Miami revealed that defendant was a "chronic alcoholic"; and Charlotte noted in an interview conducted at the same hospital that her husband's drinking problem spanned the past twenty years, during which he averaged approximately twelve drinks a day. Moreover, Dr. Isaacson, in his report, notes that defendant gave a history of fugue and amnesia during the couple of years preceding the killing,

57

in which there were lapses of time for which defendant could not account. Although Dr. Isaacson suggests that these lapses were not necessarily in association with the drinking of alcohol, neither is there any indication that during these past episodes, defendant experienced any of the extreme anxieties (i.e., business or marital failures) which triggered the alleged dissociative reaction on the night of August 30–31. I find that defendant was a chronic alcoholic during that time, and I believe that there is a reasonable nexus between these memory lapses and his alcoholic intake. I cannot accept diagnoses which discount almost completely not only the defendant's history of chronic alcoholism but also the high level of alcohol in his blood on the evening of August 30–31.

My finding that the Government has shown beyond a reasonable doubt that defendant was sane during the commission of the crime is based only secondarily upon the weaknesses in the psychiatric testimony. The lay testimony of the wife, the police officers and hospital personnel who were in defendant's presence within hours of the fatal shooting, belies the picture painted of defendant as a man out of touch with reality. In the early morning hours of August 31, defendant made numerous admissions and other statements which suggest that Frank Downey was keenly aware of what he had done, why he had done it, and indeed expressed satisfaction with the result.[6]

In the presence of the ambulance driver, defendant told his wife that he had committed the homicide for her and

---

[6] I am reminded of Raskolnikov's diagnosis of his own motivations for murder described to Sonia in Fyodor Dostoyevsky's "Crime and Punishment". Raskolnikov explained, "I wanted to murder without casuistry, to murder for my own sake, for myself alone! I didn't want to lie about it, even to myself . . . I did the murder for myself, for myself alone, . . . I wanted to find some thing else; it was something else led me on. I wanted to find out then, and quickly, whether I was a louse like everybody else—or a man. Whether I can step over barriers or not, whether I dare stop to pick up or not, whether I am a trembling creature or whether I have the right . . . ,"
At this point Sonia interrupted, "To kill? Have the right to kill?? . . ."

their son. En route to the hospital for the alcohol-blood test, defendant told the accompanying officers that the victim was his best friend; that he shot him in the stomach first, and when he fell to his knees, he shot him a second time; that he would do it again. At the police station, the desk sergeant overheard defendant's telephone conversation wherein he stated to some unknown person on the other end of the line that he did not wish to be bailed out; that he had killed "the mother fucker", and he would rather spend his time in jail. Strangely, Dr. Isaacson, who noted that defendant withdrew from the dissociative state "within seconds" after the shooting because the pressures were gone and the threatened crisis had passed, did not find the foregoing statements inconsistent with the hypothesis. In defendant's trial memorandum, it is argued that such statements uttered at a point in time subsequent to the killing do not directly bear on defendant's state of mind at the moment of the killing. However, decisional authority has recognized that evidence of a defendant's behavior at points in time reasonably close to the crime is certainly probative. Chase v. United States, 468 F.2d 141, 143 (7th Cir. 1972).

The lay testimony introduced by the defense, primarily through the testimony of Charlotte and defendant's sailing friend, tended to show, inter alia, that during a period of 24 hours or more preceding the homicide, defendant threatened to commit suicide, had walked a number of miles in a rainstorm, and appeared generally irrational. These symptoms, I believe, show that Frank Downey was clearly depressed during the several days, and indeed even months, prior to the murder. But this depression alone does not rise to the level of insanity. It is further significant to note that the lay witnesses presented by the Government were less interested in the outcome of the case

than were the wife and friend. See United States v. Greene, 497 F.2d 1068, 1073 (7th Cir. 1974).

In insanity cases in which the ultimate determination hinges so completely on the individual facts presented, there is a natural hesitation to rely heavily on precedent. The Government, however, has cited several cases concerning the defense of mental illness based on dissociative reaction which, I believe, buttress my position herein. In Gallion v. United States, 386 F.2d 255 (9th Cir. 1967), the Ninth Circuit affirmed a conviction by a district judge sitting without a jury in a criminal case in which a psychiatrist testified that the defendant was "in a fugue state" and had a "dissociative reaction during the commission of the crime." The Court found little merit to the defense argument that the only evidence offered on the question of capacity was that of the psychiatrist, pointing out that the cross-examination of the doctor, plus various admissions that the defendant made to the F.B.I., greatly weakened the expert testimony. Id. at 256. The case of United States v. Warren, 447 F.2d 278 (2d Cir. 1971), reflects a similar acknowledgment by the Second Circuit that determinations on the issue of sanity are not to be made solely on the basis of psychiatric testimony. The Court noted that:

[w]ere the case to have been decided solely by appellant's experts, the weight of their writings, their number of patients and their conclusions as to appellant's "fugues", "confabulation" and "disassociated state" would have tilted the scales overwhelmingly in appellant's favor. But the decision was for the jury and there were many other witnesses including the defendant himself.

Id. at 280.

Probably the cases most analagous to the one sub judice, at least from a factual standpoint, are United States v. Borum, 464 F.2d 896 (10th Cir. 1972), and Kane v. United

States, 399 F.2d 730 (9th Cir. 1969). In Borum, the defendant was charged with the murder of his wife. At trial, the defendant maintained that "he was deprived of the full opportunity to defend himself because of his inability to remember the events which transpired at the time of the offense." Id. at 898. Psychiatric testimony at the pre-trial competency hearing indicated that defendant suffered a memory failure commencing either just before or just after the murder of his wife. The amnesia, according to the doctor, was most probably the result of an "involuntary dissociative reaction". Although the trial court made no actual determination as to whether the amnesia was real or feigned, it nonetheless apparently accepted the opinion, offered by a number of expert witnesses, that the sodium pentothol interview conducted to penetrate the defendant's memory was not necessarily conclusive on the issue. The Tenth Circuit affirmed the defendant's conviction of murder in the second degree.

In Kane, the defendant, also charged with the murder of his wife, defended on the ground of insanity. One of the defense psychiatrists claimed that the defendant's condition at the time he shot his wife was a " 'dissociative episode' brought on by the stress of the moment plus the drinking". Id. at 734. The trial court refused to accept this explanation of the defendant's conduct, noting that testimony of other three psychiatrists who testified at trial diagnosed defendant's condition as "pathological intoxication". The Ninth Circuit affirmed the defendant's conviction of involuntary manslaughter.

## VI

### DIMINISHED CAPACITY TO REDUCE TO MURDER SECOND

■■ Despite my finding from the evidence that Frank Downey was not insane at the time of the homicide of

Matschke, I still have the duty to determine whether or not defendant acted with the requisite culpable mental state to justify a conviction of murder in the first degree. From all the facts of this case, defendant's chronic alcoholism, and particularly the irrefutable evidence of his high degree of intoxication on the evening in question, I must conclude that defendant was incapable of forming that deliberate and calculating mental state which the law calls "premeditation". To be sure, voluntary intoxication or drunkenness per se will not provide an excuse for the commission of a crime. Precedential authority acknowledges, however, that a person's intoxication may be taken into consideration in determining whether a defendant possessed the requisite specific intent for the crime. See, e.g., 14 V.I.C. § 16; United States v. Romano, 482 F.2d 1183, 1196 (5th Cir. 1973); United States v. Jacobs, 473 F.2d 461, 465 (9th Cir. 1973).

However, more than the intoxication, there was a lack of direct evidence of the time span from the time defendant dropped his wife off at Matschke's to the time of and during the shooting. While it is true that premeditation can reasonably be inferred from the circumstances of (1) bringing his wife to Matschke's, and (2) returning shortly afterwards with a pistol, it is my feeling that in view of the very severe penalty for murder in the first degree in the Virgin Islands whereby the mandatory life imprisonment shall be without parole, pardon or any other form of release, my finding of the presence of premeditation should be formed upon more evidence than what has been presented in this case.

## VII

### UNAUTHORIZED POSSESSION OF A FIREARM DURING THE COMMISSION OF A CRIME OF VIOLENCE

█ Very little evidence was presented as to Count II, the charge of unauthorized possession of a firearm during

commission of a crime of violence. Title 23 V.I.C. § 477(a). The evidence, however, was undisputed that defendant shot Matschke with a .45 caliber pistol; that Matschke died from sanguination caused by two .45 caliber bullet wounds; that Government's Exhibit No. 1, a military .45 caliber pistol, was stipulated by government and defense to be the gun picked up from the table at an arm's length away from defendant shortly after the shooting. Detective Noel Martin testified that he checked the firearm with appropriate authorities and learned that it was not registered in the Virgin Islands and that, in fact, it still belonged to the United States Government as a military weapon, there being no record of any sale or transfer of ownership thereof outside of the armed services. Although I do not know how or where defendant obtained the gun, I do find that he had possession of it and used it in the murder of Matschke in violation of 23 V.I.C. § 477(a).

### ORDER

Having found defendant guilty of the lesser included offense of Murder in the Second Degree and Unlawful Possession of a Firearm Used During the Commission of an Act of Violence, I remand defendant to the custody of the Commissioner of Public Safety to be detained pending sentencing.