GOVERNMENT OF the VIRGIN ISLANDS

v.

Ivar FREDERICKS, Appellant.

No. 77–1963.

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 1977.

Decided April 24, 1978.

As Amended June 7, 1978.

**928**

Albert A. Sheen, Hodge & Sheen, Christiansted, St. Croix, V. I., for appellant.

Mark L. Milligan, Asst. U. S. Atty., Dept. of Justice, Christiansted, St. Croix, V. I., for appellee.

Before ADAMS, ROSENN and HUNTER, Circuit Judges.

## OPINION

JAMES HUNTER, III, Circuit Judge:

Defendant Ivar Fredericks appeals from his conviction of voluntary manslaughter, 14 V.I.C. § 924(1), in the District Court of the Virgin Islands. He has been sentenced to imprisonment for a term of six years. This appeal challenges the adequacy of the jury instructions relating to his insanity defense. We affirm.

### I

In the early hours of the morning of March 7, 1977, Fredericks drove to a dilapidated house, owned by his brother, in Christiansted, St. Croix. Defendant had been drinking before he arrived at the building. The house was then temporarily occupied by some of his brother's acquaintances.

Fredericks broke into the house, and the occupants, including Eric Baird, a/k/a "Shorty," attempted to flee. Defendant caught up with Mr. Baird, followed him outside and across the street, and repeatedly beat him with a pipe wrench. The victim died before reaching the hospital.

Defendant then drove from the house to a lot approximately one quarter of a mile from his residence and fell asleep in his car. The car was later located by investigators and searched pursuant to a warrant. Inside were found the pipe wrench used in the beating and a T-shirt stained with decedent's blood.

Fredericks was arrested on March 7, 1977 and charged with first degree murder, 14 V.I.C. § 922(a)(1), in an information filed on March 9. Subsequently Judge Warren H. Young entered an order requiring examination of defendant by Dr. Olaf Hendricks, a psychiatrist.

On April 20, 1977, defendant filed notice of his intent to rely on the defense of insanity, based on the initial report of Dr. Hendricks. Judge Young, by order dated May 4, 1977 and amended on May 6 and 13, committed defendant to the Knud-Hansen Memorial Hospital on St. Thomas for psychiatric observation, examination and treatment.

Fredericks' jury trial began on June 6, 1977. The principal defense relied on by defendant was insanity, with an interrelated claim of intoxication. Three expert witnesses were called to support the defense: Dr. Hendricks, who had first examined defendant after his arrest, Dr. Leighman Lu, a psychiatrist at Knud-Hansen Memorial Hospital, and Dr. Kurt Konietzko, a clinical psychologist at the hospital.

Dr. Hendricks, after recounting Fredericks' case history, testified that he had initially diagnosed defendant as an alcoholic paranoid but had later reached the opinion that he was a latent schizophrenic. Dr. Lu disagreed with both of these diagnoses and stated his finding that Fredericks had a "paranoid personality." Dr. Konietzko analyzed defendant's condition as a paranoid personality with an underlying latent schizophrenia. Dr. Hendricks gave his opinion that the beating death of Mr. Baird was a result of Fredericks' mental illness, but Dr. Lu testified that he found no evidence of a causal relationship.

On June 9, the jury returned a verdict of not guilty on the charge of first degree murder, but guilty on the lesser included offense of voluntary manslaughter. On June 29, Fredericks was sentenced to imprisonment for a term of six years with directions that he be allowed to continue psychiatric treatment.

Defendant filed a timely notice of appeal, raising two issues: whether the trial court erred in denying his request that the jury be given a definition of "mental disease or defect;" and whether the court wrongly refused to instruct the jury on the consequences of a verdict of not guilty by reason of insanity. Both questions were properly preserved for appeal by timely objections to the jury charge.

## II

Under Virgin Islands law, "persons who are mentally ill and who committed the act charged against them in consequence of such mental illness" are not considered capable of committing a crime. 14 V.I.C. § 14(4). After charging the jury by repeating the statutory definition for insanity, the trial judge restated the standard which the jury should apply in evaluating an insanity defense by reference to the test formulated by then Chief Judge Biggs in *United States v. Currens,* 290 F.2d 751, 774 (3d Cir. 1961). The jury was charged:

> [T]he Defendant shall be entitled to a verdict of not guilty by reason of insanity, if, at the time of the alleged criminal conduct, the Defendant, as a result of mental illness or mental defect, lacked substantial capacity to conform his conduct to the requirements of the law.[1]

1. The charge to the jury on the insanity defense was as follows:

   The law provides that a jury shall bring in a verdict of not guilty by way of insanity if at the time of the alleged criminal conduct, the defendant was suffering from a mental illness and that he committed the act charged against him as a consequence of such mental illness. That actually comes right from our Code. That is right in the wording of our Code. The Court has put this another way, that the Defendant shall be entitled to a verdict of not guilty by reason of insanity, if, at the time of the alleged criminal conduct, the Defendant, as a result of mental illness or mental defect, lacked substantial capacity to conform his conduct to the requirements of the law.

   Now, the burden is on the Government to prove beyond a reasonable doubt either that the Defendant was not suffering from a mental disease or defect, or else that he, nevertheless, had substantial capacity to conform his conduct to the requirements of the law. If the

Government has not established this beyond a reasonable doubt, you shall bring in a verdict of not guilty by reason of insanity.

In considering the issue of insanity, you may consider all of the circumstantial evidence just prior to the incident, during the incident and after the incident. You should consider all of the lay testimony, that is, all of the nonexpert testimony that you had presented to you. You should consider all the evidence that has been admitted as to the Defendant's mental condition before and after the offense charged, as well as the testimony as to the Defendant's mental condition at the time of the incident. The evidence as to the Defendant's mental condition before and after the incident has been admitted solely for the purpose of assisting you to determine the Defendant's mental condition on the date and time of the alleged offense.

. . . . .

. . . [Y]ou are not bound by the experts' opinion and you may accept or reject their

The dissent argues that the Virgin Islands statute on insanity was constructed around the *Durham* rule enunciated in *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). The statute was apparently influenced by the "product test" of *Durham* which was rejected in the *Currens* opinion, *see* 290 F.2d at 771–774. While of course this court cannot supplant the Virgin Islands statute with its own notions of the insanity defense, we do not read the *Currens* test as being fundamentally at odds with the statute.[2] This court has given some indication that the *Currens* test may properly be used in the Virgin Islands. *See Government of the Virgin Islands v. Bellott,* 495 F.2d 1393, 1397–98 & n.3 (3d Cir. 1974). Both parties to this appeal seem to have accepted the trial judge's use of *Currens* language; no objection was raised at trial, and neither party has briefed or argued this issue on appeal. In light of these circumstances, we do not believe that the charge given to the Fredericks jury contained a fundamental error which this court should raise *sua sponte. See* F.R.Crim.P. 30; *Government of the Virgin Islands v. Navarro,* 513 F.2d 11, 16 (3d Cir.), *cert. denied,* 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 698 (1975). We shall therefore consider the contentions of the appellant in the context of the charge actually given to the jury.

The defendant's first contention on appeal is that the rule of *Currens* which was applied by the trial judge should have been augmented by the following language:

> Mental disease (or defect) includes any abnormal condition of the mind, regardless of its medical label, which substantially affects mental or emotional processes and substantially impairs behavior controls. The term "behavior controls" refers to the processes and capacity of a person to regulate and control his conduct and his actions.
>
> In considering whether the defendant had a mental disease (or defect) at the time of the unlawful act with which he is charged, you may consider testimony in this case concerning the development, adaptation and functioning of these mental and emotional processes and behavior controls.

The judge ruled that he would not give the charge. In the course of instructing the jury, however, the judge did take cognizance of the definition of mental disease or defect by commenting:

> I don't think I need to go into all the ramifications on what is or what is not a mental illness. You have had that given to you by the experts and even by the lawyers. As I say, it is your decision.

After the charge had been given, defendant objected to the omission of his requested instruction. In overruling the objection, the judge commented, "That is argument and not instructions."

opinions. You are not bound by their definitions, their labels as to what is or what is not a mental illness. It is for you to decide whether Mr. Fredericks did, in fact, kill Mr. Baird, either murder first, murder second, or voluntary manslaughter, and if you so decide, then it is for you to decide whether Mr. Fredericks was, at the time mentally ill. If you so decide, then you must go one step further and you are to decide whether he acted as he did as a consequence or by reason of that mental illness.

. . . . .

I don't think I need to go into all the ramifications on what is or what is not mental illness. You have had that given to you by the experts and even by the lawyers. As I say, it is your decision.

2. The dissent relies heavily upon a lengthy letter written by former Chief Judge Biggs on July 19, 1956, to the chairman of the Advisory Committee on the Revision of the Virgin Islands Code when it was considering legislation on the subject of criminal insanity. In his exhaustive and scholarly opinion in *United States v. Currens,* 290 F.2d 751 (3d Cir. 1961), dealing with the proper standard to be adopted in this circuit, Judge Biggs had the opportunity to consider "approximately seventy decisions . . . built around the *Durham* decision and the *Durham* formula over a period of approximately seventy years." *Id.* at 769. Judge Biggs noted that the *Durham* formula had been "severely criticized on the ground that it is too vague and indefinite to provide a workable rule for the determination of a criminal responsibility," *Id.* at 771, and projected a rule which needfully fills the vague interstices of the formula which is the basis of the Virgin Islands statute.

Defendant argues that the instruction he requested was necessary to avoid jury confusion over the correlation of the medical labels used by expert witnesses to describe his mental condition and the legal definition of "insanity." At trial, much of the examination and cross-examination of the medical experts dealt with the appropriate label to attach to defendant's condition.[2a] *Currens* emphasized that the medical label used by experts is not determinative on the issue of insanity; the jury has an independent role in determining criminal responsibility based on its weighing of all evidence, expert and lay, of the defendant's mental condition before and after the acts charged. 290 F.2d at 772-75. Defendant contends that, without the definition he proposed, the jury had no basis except the medical labels on which to make a determination of whether defendant suffered from a mental disease or defect.

Much of the substance of the proposed instruction was already covered in the judge's charge to the jury under *Currens*. The requested instruction contained the concept of a mental disease or defect as an abnormal condition of the mind which substantially impairs "behavior controls." It also defined "behavior controls" as the capacity of a person to regulate and control his conduct or actions. Both of these aspects of the requested charge are contained in the *Currens* instructions given during Fredericks' trial that defendant should be acquitted if

> at the time of the alleged conduct, the Defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law.

The part of the requested charge that directed the jury not to be bound by the medical labels used by the experts and to consider all evidence bearing on "the development, adaptation, and functioning of . . . mental and emotional processes and behavior controls" is covered by the following part of the jury charge:

In considering the issue of insanity, you may consider all of the circumstantial evidence just prior to the incident, during the incident, and after the incident. You should consider all of the lay testimony, that is, all the non-expert testimony that you had presented to you. You should consider all the evidence that has been admitted as to the Defendant's mental condition before and after the offense charged, as well as the testimony as to the Defendant's mental condition at the time of the incident. . . .

> .      .      .      .      .

. . . [Y]ou are not bound by the experts' opinion and you may accept or reject their opinions. You are not bound by their definitions, their labels as to what is or what is not a mental illness. It is for you to decide . . . whether Mr. Fredericks was, at the time [of the homicide], mentally ill.

Further, even if the contents of the requested instruction were not substantially covered by the charge to the Fredericks' jury—specifically the fixing of a medico-legal definition of mental disease or defect as an "abnormal condition of the mind which substantially affects mental or emotional processes"—we do not believe that such a charge should be mandated. The proposed instruction would not illuminate the charge given and could conceivably confuse the jurors in their application of it. We do not think it self-evident that the concepts of "mental or emotional processes" and "behavior controls" would be more intelligible to a jury than the concept now embodied in *Currens* of a mental disease or defect which deprives defendant of the substantial capacity to conform his conduct to the requirements of the law. Additionally, the evidence adduced during the Fredericks' trial did not bear closely on these terms of the requested charge. Indeed, we are not convinced that this specification of psychiatric

---

**2a.** We would note that emphasis on technical labels for defendant's mental condition should be minimized. *See United States v. Currens,* 290 F.2d 751, 772 (3d Cir. 1961); *United States*

*v. Brawner,* 153 U.S.App.D.C. 1, 16, 471 F.2d 969, 984 (1972) (en banc); *United States v. Chandler,* 393 F.2d 920, 926 n.17 (4th Cir. 1968) (en banc).

terminology is correct in light of current (let alone future) psychiatric thought.

■ We also believe that requiring that defendant's proposed instruction be given would conflict with the responsibility of the jury in considering an insanity defense. As this court indicated in the *Currens* opinion, the decision of whether a defendant is affected by a mental disease or defect rests with the jury's evaluation of all lay and medical evidence in the case. 290 F.2d at 772–74. *See Government of the Virgin Islands v. Bellott, supra,* 495 F.2d at 1397–98; *United States v. Collins,* 491 F.2d 1050 (5th Cir.), *cert. denied,* 419 U.S. 857, 95 S.Ct. 104, 42 L.Ed.2d 90 (1974); *Blake v. United States,* 407 F.2d 908, 913 (5th Cir. 1969) (en banc). The requested instruction, insofar as not covered by the *Currens* charge, directs the jury to trial testimony given in terms of "mental or emotional processes" and "behavior controls" as the determinate of this decision. The definition of mental disease or defect is essentially a factual, medical question, not a legal issue. The court should not encroach upon the jury's function of resolving possibly competing psychiatric views of this definition.

The development of the law regarding the insanity defense in federal courts supports our conclusion. While almost all the courts of appeals have adopted a standard for insanity similar to that of our circuit in *Currens,* only the Court of Appeals for the District of Columbia has insisted that instructions to the jury contain a "legal definition" of mental disease or defect.

The first appearance of the sort of instruction requested by defendant was in *McDonald v. United States,* 114 U.S.App. D.C. 120, 312 F.2d 847 (1962) (en banc). At that time the District of Columbia court was following the insanity test of *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), which required the jury to determine whether the acts charged were the "product" of a mental disease or defect.[3] In *McDonald,* the court noted that its experience under *Durham* had shown that a *"judicial* definition" of disease or defect was needed to emphasize that "neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect." 114 U.S.App.D.C. at 824, 312 F.2d at 851.

The American Law Institute in its Model Penal Code and this court in its decision in *Currens* similarly noted the problems of vagueness in the *Durham* "product" test. Instead of attempting to define more closely the term "mental disease or defect," both the Institute and this court departed from *Durham.*[4] The ALI formulated a rule which depends on whether the defendant, as a result of a mental disease or defect, either lacks the substantial capacity to appreciate the wrongfulness or criminality of his conduct or lacks the substantial capacity to conform his conduct to the requirements of the law.[5] This court's rule in *Currens* was derived in part from the ALI's test. 290 F.2d at 774 n.32.

Under both the ALI and the *Currens* rule, the problem of vagueness in the *Durham* test is ameliorated. As the dissent points out, the jury still faces two distinct issues: 1) whether the defendant suffers from a mental disease or defect and 2) whether that condition deprives him of the substantial capacity to conform his conduct to the requirements of the law. Nevertheless, the insertion of the second step gives guidance to the jury which was lacking in *Durham.* The jury, when informed of the

3. "[A]n accused is not criminally responsible if his unlawful act was the product of mental disease or defect." *Durham v. United States,* 94 U.S.App.D.C. 228, 240–41, 214 F.2d 862, 874–75 (1954).

4. ALI Model Penal Code § 4.01, Comments 5, 6 (Tent. Draft No. 4, 1955); *United States v. Currens,* 290 F.2d 751, 771 (3d Cir. 1961).

5. ALI Model Penal Code § 4.01(1) (1962):

Mental Disease or Defect Excluding Responsibility

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of the law.

result of a mental disease or defect which would constitute legal insanity, is able better to understand what a mental disease or defect is.

The approach of the ALI and this circuit, which has omitted the *McDonald* definition of mental disease or defect, is now widely accepted among federal courts.[6] Although some of these courts have discussed the criticism of the *Durham* test raised in *McDonald,* they have assumed that the ALI test would eliminate the problem.[7]

■ The sole exception currently is the District of Columbia court. When that court adopted the ALI standard, it ruled that the *McDonald* definition should be retained to cure the "inherent ambiguity" of the term "mental disease or defect." *United States v. Brawner,* 153 U.S.App.D.C. 1, 15–16, 471 F.2d 969, 983–84 (1972) (en banc). As we mentioned above, we do not find inherently ambiguous the concept of a mental disease or defect which deprives defendant of the substantial ability to conform his conduct to the requirements of the law. We therefore agree with the majority of circuits which have not inserted the *McDonald* instruction into the ALI test. We hold that under a *Currens* charge as was given in this case, the trial judge was not required to give the instruction requested by Fredericks on the "legal definition" of mental disease or defect.

### III

Defendant's second claim is that the trial judge improperly refused to inform the jury during instructions of the consequences of a verdict of not guilty by reason of insanity. Following such a verdict, the defendant faces mandatory commitment proceedings under 5 V.I.C. § 3637(a).[8]

Defendant attempted to direct the jury's attention to the disposition of a defendant after an insanity verdict during two phases of the trial. First, during *voir dire,* he requested that the jury be told that, following a verdict of not guilty by reason of insanity, a defendant would be committed to a public institution. This information would be followed by the question, whether any juror, knowing this, would find it difficult voting for such a verdict.

The requested question was discussed during a conference in chambers. The prosecutor objected on the grounds that it was improper to inform the jury of the consequences of a verdict, since these should not influence their deliberations on the evidence. The defense counsel answered that he feared that a juror would hesitate to agree to a verdict of not guilty by reason of insanity if he felt that defendant would thereafter be allowed to "walk out."

The court ruled that the question would be given. The trial judge expressed two reasons for his decision. First, if a juror disagreed with the idea of institutional confinement, he might be unwilling to assent to an insanity verdict. Next, the judge expressed his concern over the common misapprehension that an insanity verdict allows

---

6. *See United States v. Freeman,* 357 F.2d 606 (2d Cir. 1966); *United States v. Chandler,* 393 F.2d 920 (4th Cir. 1968) (en banc); *Blake v. United States,* 407 F.2d 908 (5th Cir. 1969) (en banc); *United States v. Smith,* 404 F.2d 720 (6th Cir. 1968); *United States v. Shapiro,* 383 F.2d 680 (7th Cir. 1967) (en banc); *United States v. Frazier,* 458 F.2d 911 (8th Cir. 1972); *Wade v. United States,* 426 F.2d 64 (9th Cir. 1970) (en banc); *Wion v. United States,* 325 F.2d 420 (10th Cir. 1963) (en banc), *cert. denied,* 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309 (1964). *See also Amador Beltran v. United States,* 302 F.2d 48, 52 (1st Cir. 1962).

7. *See, e. g., Wade v. United States,* 426 F.2d 64, 68–69, 71–73 (9th Cir. 1970) (en banc); *Blake v. United States,* 407 F.2d 908, 914, 916 (5th Cir. 1969) (en banc); *United States v. Smith,* 404 F.2d 720, 726, 727 (6th Cir. 1968); *United States v. Chandler,* 393 F.2d 920, 925–26, 928–29 (4th Cir. 1968) (en banc).

8. 5 V.I.C. § 3637(a) provides:

(a) If the defense is the mental illness of the defendant, the jury shall be instructed, if they find him not guilty on that ground, to state that fact in their verdict, and the court shall thereupon commit the defendant to a suitable public institution for custody, care and treatment from which he shall not be discharged until the court is satisfied that he has regained his capacity for judgment, discretion and control of the conduct of his affairs and social relations.

defendant to go free.[9] The judge therefore made the following statement to the array from which all of Fredericks' jurors were selected:

If your verdict, if the jury's verdict comes out not guilty by reason of insanity, the Defendant must be committed to a public institution for custody and care and will not be discharged from that institution until the Court is satisfied that he has regained his capacity for judgment, discretion and control so that he no longer represents a danger to himself or to others.

Now, having that in mind, is there anyone who would have difficulty returning a verdict such as an insanity verdict, not guilty by reason of insanity, if it is warranted, if the facts warrant such a verdict, is there anyone here that would have difficulty with such a verdict if it is warranted? If so, please stand.

I might elaborate a little bit, some people feel that just going to an institution is not enough if a person had done some act that a person should normally, a sane person would be punished for, so if anyone has that difficulty or has that position, would you please stand?

There was no affirmative response.

The second attempt to inform the jury came when the court entertained requests for instructions. The defendant submitted the following proposed instruction:

You are instructed that if you find the defendant not guilty by reason of mental illness, you must state that fact in your verdict. If you do so find, the law in this jurisdiction requires that the court shall thereupon commit the defendant to a

suitable public institution for custody, care and treatment from which he shall not be discharged until the court is satisfied that he has regained his capacity for judgment, discretion and control of his affairs and social relations.

The charge was not given. The jury was directed not to consider what punishment might result from a guilty verdict.

Defendant objected to the omission of the instruction, which contained the same information as was given all jurors during *voir dire*. The court answered,

I am denying that because I don't feel that, that was important to find out the state of mind of jurors on voir dire, but that it is not a proper instruction to tell them what might happen as a result of their verdict.

In this appeal defendant argues that the instruction informing the jury of the consequences of a verdict of not guilty by reason of insanity should be given to insure that jurors do not labor under the misapprehension that the defendant would go free after such a verdict. Defendant contends that jurors, from common knowledge, know the general consequences of the verdicts of guilty and not guilty but often carry with them into deliberations a misunderstanding of the consequences of an insanity verdict. He concludes that, if jurors wrongly believe that an insane and possibly dangerous defendant will be released after a verdict of not guilty by reason of insanity, they will feel constrained by fear for the public safety to return a guilty verdict. Fredericks relies on cases in the District of Columbia [10] and in a growing number of states [11] which

---

9. The court stated in part:

I think most people say "Well, an insanity defense, I wouldn't allow that because all that happens is he goes to an institution and he is there about half year and then he is free."

10. *Lyles v. United States,* 103 U.S.App.D.C. 22, 254 F.2d 725 (1957) (en banc); *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). *See also United States v. Brawner,* 153 U.S. App.D.C. 1, 18–20, 471 F.2d 969, 996–98 (1972) (en banc).

11. *Commonwealth v. Mutina,* 366 Mass. 810, 323 N.E.2d 294 (1975); *State v. Babin,* La., 319 So.2d 367, *on rehearing,* 319 So.2d 379 (La. 1975); *Schade v. State,* 512 P.2d 907 (Alaska 1973); *People v. Cole,* 382 Mich. 695, 172 N.W.2d 354 (1969); *Bean v. State,* 81 Nev. 25, 398 P.2d 251 (1965), *cert. denied,* 384 U.S. 1012, 86 S.Ct. 1932, 16 L.Ed.2d 1030 (1966); *State v. Hamilton,* 216 Kan. 559, 534 P.2d 226 (1975) (based on state statute); *State v. Pike,* 516 S.W.2d 505 (Mo.App.1974) (same). *See also State v. Hammonds,* 290 N.C. 1, 224 S.E.2d 595 (1976); *State v. Krol,* 68 N.J. 236, 344 A.2d 289 (1975); *State v. Shoffner,* 31 Wis.2d 412,

require that an instruction substantially like the one requested be given.[12]

We first note that, for the Virgin Islands, this argument is not foreclosed by our decision in *United States v. Alvarez*, 519 F.2d 1036 (3d Cir. 1975). That case held that, in federal prosecutions in this circuit, the trial judge may properly refuse to give an instruction dealing with the consequences of an insanity verdict. We pointed out that, except in the District of Columbia, there is no federal law requiring commitment proceedings for a defendant found not guilty by reasons of insanity.[13] We therefore concluded that it would be misleading in a federal prosecution to inform the jurors that an insane defendant would be committed. *Id.* at 1047–48.

In the Virgin Islands, the legislature has provided for commitment proceedings following an insanity verdict, 5 V.I.C. § 3637(a). The rationale in *Alvarez* is therefore inapplicable to Virgin Islands prosecutions. The question of whether an instruction should be given on consequences of an insanity verdict is an open one under Virgin Islands law.

▮ Resolution of this issue poses a difficult balance of the functions of the judge and jury. It is clear that the consequences following any verdict are solely a matter for the judge and for the legislature. What is done with defendant after any verdict should not in the slightest affect the decision of the jury on whether that defendant is guilty or innocent. See, *e. g., United States v. McCracken*, 488 F.2d 406, 425 (5th Cir. 1974); Lyles v. United States, 103 U.S. App.D.C. 22, 25, 254 F.2d 725, 728 (1957) (en banc), *cert. denied* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

Nonetheless, the requested instruction on the consequences of the insanity verdict presents a *unique* situation where there may be a common misunderstanding, not of the particulars of the result of a verdict, but of the nature of the verdict itself.[14] The words "not guilty" contained in the insanity verdict invoke the idea that a potentially dangerous defendant will be unconditionally released after trial, while in fact he faces mandatory corrective proceedings. A juror who feels that a verdict importing freedom for defendant will endanger the community might, out of his sense of social responsibility, be swayed from rational deliberation and be unwilling to weigh properly the evidence of defendant's mental condition. See, *e. g., United States v. Grimes*, 137 U.S.App.D.C. 184, 190, 421 F.2d 1119, 1125 (1969), *cert. denied*, 398 U.S. 932, 90 S.Ct. 1831, 26 L.Ed.2d 98

143 N.W.2d 458 (1966) ("prefer" that instruction be given).

We note, however, that the majority of states either forbid the instruction or merely permit it to be given in the trial judge's discretion. *See State v. Wallace*, 333 A.2d 72, 78 (Me.1975); *Lonquest v. State*, 495 P.2d 575, 584 (Wyo.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972); *People v. Adams*, 26 N.Y.2d 129, 309 N.Y.S.2d 145, 151, 257 N.E.2d 610, *cert. denied*, 399 U.S. 931, 90 S.Ct. 2262, 26 L.Ed.2d 800 (1970). *See generally State v. Hood*, 123 Vt. 273, 187 A.2d 499 (1963); *State v. Wade*, 96 Conn. 238, 113 A. 458 (1921); Annot., 11 A.L.R.3d 737 (1967 & Supp.1977).

12. Fredericks also urges that the instruction he requested is required by the language of 5 V.I.C. § 3637(a), *quoted* at note 8 *supra*. We read the statute to require only that the jury be instructed to return a verdict of not guilty by reason of insanity if they conclude that defendant is not guilty for that reason. The remainder of the section deals with the court's treatment of defendant after such a verdict.

13. Under federal law outside of the District of Columbia (where the commitment procedures of 24 U.S.C. §§ 211, 212 (1970) and D.C.Code § 24–301 are available), a defendant acquitted by reason of insanity is "simply released with the hope that State authorities may commence civil commitment proceedings." *United States v. Alvarez*, 519 F.2d 1036, 1048 (3d Cir. 1975).

14. Cases which have required the instruction on the consequences of an insanity verdict have emphasized that this verdict is unique and, unless guided by statute, have consistently and firmly distinguished this requirement from informing the jury of consequences of other verdicts. See, *e. g., State v. Hammonds*, 290 N.C. 1, 224 S.E.2d 595, 602 (1976); *State v. Babin*, 319 So.2d 367, 379–80 (La.1975); *People v. Cole*, 382 Mich. 695, 172 N.W.2d 354, 365 (1969); *Lyles v. United States*, 103 U.S.App. D.C. 22, 25, 254 F.2d 725, 728 (1957) (en banc), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

(1970); *Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294 (1975). This type of problem arises solely with respect to the insanity verdict.

To accept defendant's reasoning, however, would be a substantial departure from the usual rules for allocating responsibility between the judge and jury. *See, e. g., United States v. McCracken*, 488 F.2d 406, 423 (5th Cir. 1974); *United States v. Borum*, 464 F.2d 896, 901 (10th Cir. 1972). He asks, in effect, that we assume that the jury will disregard its instructions to ignore the consequences of its verdict and then allow erroneous extraneous information to affect its judgment. The cure proposed is to give the jury the correct information, which it should then be instructed to ignore.

Further, we note that accepting this reasoning could be prejudicial to a criminal defendant. A juror who is convinced that a defendant is dangerous, but who believes that he did not in fact commit the acts charged, might be willing to compromise on a verdict of not guilty by reason of insanity rather than insist on an acquittal. *See, e. g., State v. Wallace*, 333 A.2d 72, 78 (Me. 1975); *People v. Adams*, 26 N.Y.2d 129, 309 N.Y.S.2d 145, 151, 257 N.E.2d 610, 614, *cert. denied*, 399 U.S. 931, 90 S.Ct. 2262, 26 L.Ed.2d 800 (1970).

The premise of defendant's argument is not that the judge made an erroneous statement of the law, but rather that he failed to rebut a misconception possibly held by jurors before they entered the courtroom. In this case, however, each juror was informed during *voir dire* questioning that the defendant must be civilly committed

after a verdict of not guilty by reason of insanity. This information was given upon defendant's request for the express purpose of informing the jurors of these consequences. Thus, whatever the belief of the jurors before their involvement with this case, all of them were told the correct knowledge from an authoritative source before the trial began.[15]

■ We therefore find no prejudice to defendant in this case. Even if the judge did commit an error in failing to give the instruction, the error would have been harmless. We have no doubts that the jury reached its verdict based solely on the evidence. Since the judge gave the jurors the information which defendant requested, this is not an appropriate case to decide whether, as a matter of Virgin Islands law, an instruction on the consequences of an insanity verdict must be given when requested by defendant.[16]

We find no reversible error in this case and affirm.

ADAMS, Circuit Judge, dissenting.

Ivar Fredericks, whose conviction is before us, appeals on the ground that a critical request by him for jury instructions was improperly denied. Specifically, he claims that he was entitled to have the trial court explain to the jury the terms "mental disease or defect" and "mental illness"—as these concepts affected the defense of insanity—the sole defense which Fredericks asserted. For the reasons set forth, I believe his contention has merit, and that a new trial is required.[1]

---

15. We note that it is not at all clear that the jury does in fact misunderstand the consequences of a verdict of not guilty by reason of insanity. *Compare, e. g., State v. Hood*, 123 Vt. 273, 187 A.2d 499, 501 (1963), *with, e. g., Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294, 300–301 (1975), *and Lyles v. United States*, 103 U.S.App.D.C. 22, 25, 254 F.2d 725, 728 (1957) (en banc), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

16. Several courts have first observed prejudice to a defendant absent the sort of charge Fredericks requests before deciding to require such an instruction. *See, e. g., State v. Hammonds*, 290

N.C. 1, 224 S.E.2d 595 (1976); *Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294 (1975).

1. Fredericks also contends that the jury should have been informed of the fact that under Virgin Islands law acquittal by reason of insanity does not result in release, but rather in confinement until the defendant can be certified as having "regained his capacity for judgment, discretion and control. . . ." *See Lyles v. United States*, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957) (*en banc*) *cert. denied* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1097 (1958). Since at *voir dire* the jury was informed of the effect of

## I.

The insanity defense has traditionally been a creature of the common law. Yet, we are faced in this case with a question involving the propriety of a jury instruction explicating that defense in the Virgin Islands, a jurisdiction whose standard of criminal responsibility has been set forth by statute.

In evaluating a request for jury instructions defining "mental illness", the majority relies on the common law which is applied by this circuit in the absence of controlling statute and upon which the trial court based its charge. Such an approach is impermissible in my view, for unlike the majority, it seems to me that our role is to look first to the statutory enactments governing criminal responsibility in the Virgin Islands. This difference of analysis in turn yields divergent results, for the test adopted by the governing statute is at odds with the standard applied by this circuit when unconstrained by legislation.

Nonetheless, since it is my understanding that the Virgin Islands statute represents the triumph of a judicial innovation in a legislative arena, the proper interpretation of that provision requires a limited excursion down the well-travelled path which marks the development of the defense of insanity.

## A.

To a considerable extent, the law of criminal responsibility has acted as a screen upon which the community has projected its visions of criminal justice. As society's understanding of the workings of the human mind and the role of the individual in the social structure has evolved, the paradigm of the mental state which will justly exonerate the perpetrator of what would ordinarily be a criminal act has altered in response. Thus, the common law moved from strict liability for such conduct to a requirement of *mens rea*, and then tempered its sanctions with a recognition of insanity as a defense to criminal charges.[2] This recognition was refined in *Hadfield's Case*[3] to reach beyond those totally deprived of reasoning ability or understanding, and appeared in its modern *locus classicus* forty years later in *M'Naghten's Case*.[4] The rule in *M'Naghten's Case* exempts individuals from criminal punishment where:

> At the time of the committing of the act the party accused was laboring under such a defect of reason, resulting from a disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong.[5]

The M'Naghten standard, however, came under increasingly heavy criticism for arbitrarily excluding certain varieties of mental disease from the reach of the insanity defense. More basically, critics charged that the rule misleadingly focused attention on the capacity to distinguish "right" from "wrong" at a time when recognized psychiatric impairments were understood as unitary entities which distorted both cognitive and effective capacities.[6]

a not guilty by reason of insanity verdict, as the majority points out, the failure to give the requested instruction was harmless.

2. *See* R. Perkins, Criminal Law 738 (1957); Gray, *The Insanity Defense: Historical Development and Contemporary Relevance*, 10 Am. Crim.L.Rev. 559, 560–562; Sayre, *Mens Rea* 45 Harv.L.Rev. 974, 1004–1005 (1932); *United States v. Austin*, 533 F.2d 879, 886–887 (3d Cir. 1976) (Adams, J. dissenting).

3. 27 How.St.Tr. 1781 (KB 1800).

4. 10 Cl.T.F. 200, 210 Eng.Nep. 718, 722 (H.L. 1843).

5. *Id.* In the United States, M'Naghten's Rule was often conjoined with and sometimes replaced by the "control" or "irresistible impulse" rule. *E. g. United States v. Davis*, 165 U.S. 373, 378, 17 S.Ct. 360, 362, 41 L.Ed. 750 (1897) (M'Naghten charge qualified by additional defense available if "[will] has been so completely destroyed that his actions are not subject to it, but are beyond its control"). *Parsons v. State*, 81 Ala. 577, 2 So. 854, 856–57 (1887) (lack of "power to choose").

6. See the literature collected in *Durham v. United States*, 94 U.S.App.D.C. 228, 236–239, 214 F.2d 862, 870–73 (1954).

The second half of the Twentieth Century opened with a renewal of this criticism, and a flurry of suggested alternatives to the M'Naghten formulation. In his dissent in *U.S. ex rel. Smith v. Baldi*,[7] Chief Judge Biggs, in 1951, proposed "if the mental illness of the accused is the proximate or a contributory cause of the crime, then the accused may not be found guilty of murder," and called for the extirpation of the M'Naghten Rule by judicial, or failing that, legislative action.

In 1953, the British Royal Commission on Capital Punishment also advocated that *M'Naghten* be replaced. Two alternative tests for acquittal by reason of insanity were put forward by the Commission

(1) That the jury determine "whether at the time of the act the accused was suffering from a disease of the mind (or mental deficiency) to such a degree that he ought not be held responsible."

(2) That the jury "must be satisfied that, at the time of committing the act, the accused, as a result of disease of the mind (or mental deficiency) (a) did not know the nature and quality of the act or (b) did not know that it was wrong or (c) was incapable of preventing himself from committing it."[8]

One year after the Royal Commission report, Judge Bazelon's landmark decision in *Durham v. United States*,[9] drew heavily on the Commission's findings and rejected the M'Naghten Rule. In place of the supervened standard, *Durham* erected the so-called "product rule"; the jury in District of Columbia cases was to be instructed that

"unless you believe beyond a reasonable doubt either that [the defendant] was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity."[10] *Durham* thus represented the first vindication by the judiciary for the critics of the *M'Naghten* Rule in half a century. To round out the scenario, it should be noted that the American Law Institute, in 1955, introduced an up-dated variant of the M'Naghten test, which was subsequently adopted in the Model Penal Code.[11] The ALI standard provided:

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.[12]

Consequently, by 1956, a spectrum of authoritative formulations of the insanity defense had been generated, ranging from the traditional "right or wrong" test, to the Royal Commission's "ought not be held responsible" standard, to the "product" rule of *Durham*.

B.

It was in this context that the Advisory Committee on the Revision of the Virgin Islands Code undertook to redraft the criminal law of the Virgin Islands. The former Code had classed as incapable of committing crimes "lunatics and insane persons," but appended a mutant version of *M'Naghten's* "right or wrong" test.[13]

7. 192 F.2d 540, 568–69 (3d Cir. 1951).

8. *Report of the Royal Commission on Capital Punishment*, 111, 116 (1953).

9. 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).

10. *Id.* at 875. This formulation derived from *State v. Pike*, 49 N.H. 399 (1870).
   In 1952 the Supreme Court in *Leland v. Oregon*, 343 U.S. 790, 800–801, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), rejected an attempt to strike down the M'Naghten rule on the ground that it is violative of due process.

11. ALI Model Penal Code Tent. Draft No. 4 at p. 156, adopted as § 4.01 of Model Penal Code.

12. The ALI test also states: "As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

13. 14 VIC § 14(4) read:
   All persons are capable of committing crimes or offenses except . . . lunatics and insane persons; but a morbid propensity to commit prohibited acts existing in the mind

According to the Revision Note attached to the new statute, it was to eliminate this vestige of *M'Naghten* that the Advisory Committee amended the statutory provision.[14] As reenacted, the current version of the provision relating to the insanity defense (§ 14(4)) states:

All persons are capable of committing crimes or offenses except:

. . . persons who are mentally ill and who committed the act charged against them in consequence of such mental illness.

From its language, it would seem that the new statutory provision is the offspring of the "product" rule enunciated by the Court of Appeals of the District of Columbia in *Durham* two years previously. Certainly, this has been the interpretation of several commentators.[15] And this perception is confirmed by an exploration of the actual lineage of the provision.

The legislative history of § 14(4) specifically states that the change was suggested in letters by the Honorable John Biggs, Jr. and the Honorable Albert B. Maris.[16] Judge Maris advanced his suggestion primarily on the basis of the arguments presented in a previous letter to the Commission by Judge Biggs, which the legislative history refers to as the progenitor of the alteration.[17] Thus the fountainhead of the current provision is the analysis set forth by Judge Biggs at the time the legislation was enacted.

In expounding on his suggestion that the "Legislature of the Virgin Islands . . . create the first modern and workable statute relating to the criminal responsibility of the mentally ill." [18] Judge Biggs began by criticizing the *M'Naghten* test both on the ground that it failed to take account of non-cognitive volitional impairment, and because it was substantially under-inclusive, squarely covering only "delusional psychotics," and "quivering quaking imbeciles . . . not very likely to commit crimes

of a person who is not shown to have been incapable of knowing the wrongfulness of such acts forms no defense to a prosecution therefor.

It would appear that the former code would exonerate certain delusional psychotics (*e. g.* the individual who strangles his wife under the misapprehension that he is squeezing a lemon) as well as those lacking the cognitive capacity to distinguish right and wrong.

14. The Revision Note to 14 VIC § 14(4) states: "Paragraph (4) of this section changes the former provisions by discarding the outmoded and discredited 'M'Naghten formula' which was based upon knowledge between right and wrong, and substituting the more enlightened view as to the test by which the criminal responsibility of the mentally ill should be measured."

15. *See e. g. Blocker v. United States,* 110 U.S. App.D.C. 41, 54 n.22, 288 F.2d 853, 866 n.22 (1961) (Burger, J., concurring); A. Goldstein, The Insanity Defense 9, 45, 83 (1967).

16. The Revision Note to § 14(4) states: "This change was suggested by the Honorable John Biggs, Jr., Chief Judge of the United States Court of Appeals for the Third Circuit, in a letter to the Chairman of the Advisory Committee dated July 19, 1956, and the change was concurred in by the Honorable Albert B. Maris, Judge of the United States Court of Appeals for the Third Circuit and member of the Advisory Committee."

The correspondence referred to by the Revision Note is attached as an Appendix to this opinion.

*See* Letter from Meldrim Thomson, Jr. to Hon. John Biggs, Jr. dated August 1, 1956, acknowledging the "important and constructive suggestion" of Judge Biggs and stating that changes suggested by Judge Maris have been incorporated into legislation. In fact, the language in § 14(4) is identical with that suggested in Judge Maris' letter to the Revision Commission of July 25, 1956.

17. Judge Maris states in a letter to Hon. Leon Miller on July 25, 1956, "Referring to Judge Biggs' letter of July 19th to you . . . I would strongly urge the modification of that section along the lines which he advocates." The balance of Judge Maris' letter is simply an exposition of his proposed language. Judge Maris' proffered wording is largely congruent with that suggested by Judge Biggs. Judge Biggs put forward the following:

No person may be convicted of any criminal charge when at the time he committed the act with which he is charged he was suffering with a mental illness as defined by this Act, and in consequence thereof he committed the act.

18. Letter from Hon. John Biggs to Hon. Leon Miller, July 19, 1956, p. 1.

requiring violence and energy."[19] After carefully considering the ALI test, Judge Biggs explicitly rejected that formulation. Rather, he suggested that the "product test is the best formula presently available."[20] He traced the development of the "product" test from *Hadfield's* Case through *Pike* and his own dissent in *Baldi* to Judge Bazelon's formulation in the *Durham* opinion. Judge Biggs' letter quoted extensively from *Durham*.[21] It would appear, beyond question, then, that the present § 14(4) is in essence a codification of the product test which had recently emerged in *Durham*.[22]

C.

The success of a common-law doctrine in the courts is rarely complete or permanent, and the *Durham* rule soon attracted its own critics, both within and outside of the judiciary,[23] The building blocks of *Durham* —the concepts of "mental disease" and of "product"—were not defined by the opinion, and were criticized as overly vague. Since no definitions were proffered as to what mental conditions might constitute "diseases" or when acts could be considered the "product" of such diseases, the critics claimed the jury was left without legal guidance. As a result, the argument went, the question of criminal responsibility was resolved by a battle of psychiatric labels.[24] Moreover, the charge of artificially "compartmentalizing" the human mind, which was a factor in the demise of *M'Naghten*, was also leveled at *Durham*. It was contended that it is psychologically unrealistic to consider some acts to be the "product" of mental disease and others not.[25]

For these reasons, as well as the reluctance to abandon a hallowed precept of law, it is not surprising that it was 1961 before another federal court took up the *Durham* banner of challenge to the *M'Naghten* Rule.[26] And when that undertaking was embarked upon by Chief Judge Biggs in *United States v. Currens*,[27] the *M'Naghten* Rule was cast aside in favor of a variation of the ALI standard rather than the *Durham* formula. Although he had advocated the *Durham* Rule in his letter to the Virgin Islands' Commission in 1956, Chief Judge

19. *Id.* pp. 2–3.

20. *Id.* p. 4.

21. *Id.* pp. 4–10.

22. Judge Biggs' letter goes on to suggest that the legislature adopt language recommended by the Group for the Advancement of Psychiatry which was taken from the Pennsylvania Mental Health Act of 1951, 50 P.S. 1072(11). Since the 1951 Act has been interpreted in the context of civil commitment proceedings involving a different standard of proof and different trier of fact than the insanity defense, I believe that interpretations of the Pennsylvania statute are not proper guideposts for the construction of the Virgin Islands provision.

23. *See e. g. Blocker v. United States*, 110 U.S. App.D.C. 41, 45–53, 288 F.2d 853, 857–865 (1961) (Burger, J., concurring); *Dusky v. United States*, 295 F.2d 743 (8th Cir. 1961); *United States v. Smith*, 5 U.S.C.M.A. 314 (1954); Wechsler, *The Criteria of Criminal Responsibility*, 22 U.Chi.L.Rev. 367, 373 (1955); Reid, *Understanding the New Hampshire Doctrine of Criminal Insanity*, 69 Yale L.J. 367, 390–91 (1960); Szasz, *Psychiatry, Ethics and the Criminal Law*, 58 Colum.L.Rev. 183, 190 (1958); American Law Institute Model Penal Code § 4.01, Comments 5, 6 (Tent. Draft No. 4, 1955).

24. A particular *cause celebre* was the determinative effect given to the decision of St. Elizabeth's Hospital in Washington, D. C. to alter its classifications so as to denote sociopathy a "mental disease." This turn-about meant that in the space of a weekend the insanity defense became available to an entirely different class of defendants. Since individuals previously found "healthy" were suddenly denominated "diseased", new trials were required and convictions were reversed. *E. g. United States v. Blocker*, 107 U.S.App.D.C. 63, 274 F.2d 572 (1959) (*en banc per curiam*). *See United States v. Brawner*, 153 U.S.App.D.C. 1, 9–10 471 F.2d 969, 977–78 (1972) (*en banc*); *Blocker v. United States*, 110 U.S.App.D.C. 41, 48, 288 F.2d 853, 860 (1961) (Burger, J. concurring); *In Re Rosenfield*, 157 F.Supp. 18 (D.C.1957).

25. *See United States v. Currens*, 290 F.2d 751, 774 (3d Cir. 1961).

26. In its first six years, *Durham* was rejected by five federal courts and the courts of twenty-two states. *See* Krash, *The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia*, 70 Yale L.J. 905, 906 n.8 (1961).

27. 290 F.2d 751 (3d Cir. 1961).

Biggs now wrote that *Durham* insufficiently articulated the "relationship between mental disease and the concept of 'guilty mind'".[28] Thus, *Durham* did not provide the jury with "a standard by means of which an ultimate social and moral judgment can be rendered."[29] Accordingly, since the insanity defense was defined in the federal criminal law judicially rather than legislatively, *Durham* was now viewed as an inappropriate guide, and Chief Judge Biggs saw the issue as whether

> at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated.[30]

Such a precept, it was stated, would properly focus attention on the issue of the defendant's capacity to control his acts, and eliminate the vagueness of the "product" rule.

*Currens*, of course, remains the law of this Circuit as to federal offenses where no legislative enactment, such as that which prevails in the Virgin Islands, holds to the contrary. Other circuits have similarly declined to adopt *Durham*, and instead have favored the ALI standard.[31] Equally significant, the District of Columbia Circuit, the birth place of *Durham*, has taken cognizance of the criticisms that were directed at *Durham* as well as the operational difficulties which became manifest. Unlike the ALI formulation, which responded to the ambiguity of the term "product," yet declined to explicate "mental disease or defect," the Court of Appeals for the District of Columbia began its clarification of the *Durham* rule by defining the term "mental disease or defect." In *McDonald v. United States*, that Court, spurred by a concern that medical terminology not control legal outcomes, adopted an explicitly legal definition of "mental disease or defect." It stated that mental disease or defect included:

---

**28.** *Id.* at 773.

**29.** *Id.* at 774.

**30.** *Id.* at 774.

**31.** See cases cited in n.6, p. 933 of the majority's opinion. Among the federal courts, only the First Circuit has declined to reject the *M'Naghten* Rule, and even it has voiced doubts. *See Amador Beltan v. United States*, 302 F.2d 48, 52 (1st Cir. 1962).

With the widespread acceptance of the ALI rule, attempts to reformulate the test for the insanity defense have largely passed from the center of controversy. *But see United States v. Brawner*, 153 U.S.App.D.C. 1, 471 F.2d 969, 1022–34 (1972) (*en banc*) (Bazelon, C. J. concurring and dissenting) (suggesting a test of whether the defendant "can be justly held responsible for his actions); Fingarette, *Disabilities for Mind and Criminal Responsibility—A Unitary Doctrine*, 76 Colum.L.Rev. 236 (1976) (attempting to structure a general doctrine of criminal responsibility).

Rather, at this time, the battle lines among legal scholars are drawn largely between those who advocate abolition of the insanity defense and those who champion its retention. *Compare, e. g.* B. Wootton, Crime and the Criminal Law (1963); Goldstein, *The Brawner Rule— Why? or No More Nonsense on Non Sense in the Criminal Law, Please!*, 1973 Wash. U.L.Q. 126; Goldstein & Katz, *Abolish the "Insanity Defense"—Why Not?* 72 Yale L.J. 853 (1963);

Morris, *Psychiatry and the Dangerous Criminal*, 41 So.Cal.L.Rev. 514 (1968); *with, e. g.* H. Fingarette, The Meaning of Criminal Insanity, 1–15 (1972); A. Goldstein, The Insanity Defense, 222–26 (1967); Brady, *Abolish the Insanity Defense?—No!*, 8 Houston L.Rev. 629 (1971); Monahan, *Abolish the Insanity Defense?—Not Yet*, 26 Rutgers L.Rev. 1719 (1973); Wales, *An Analysis of the Proposal to "Abolish" the Insanity Defense in S. 1: Squeezing a Lemon*, 124 U.Pa.L.Rev. 687 (1976).

The proposed revision of the Federal Criminal Code cuts back on the "insanity defense" considerably, *see* Wales, *supra*, and a recent report of the New York State Mental Hygiene Department suggests that the insanity defense be replaced with a doctrine of "diminished responsibility." Keeler, *N.Y. Panel: Abolish "Insanity" Plea*, Philadelphia Inquirer, March 13, 1978, p. 6–B, Col. 1.

One factor underlying "abolitionist" controversy may be the growing skepticism regarding the wisdom and morality of incarceration for psychiatric reasons. *See e. g.* Burt, *Of Mad Dogs and Scientists: The Perils of the "Criminal-Insane"* 123 U.Pa.L.Rev. 258 (1974); Dershowitz, *Indeterminate Confinement; Letting the Therapy Fit the Harm*, 123 U.Pa.L.Rev. 297 (1974); Ennis & Litwack, *Psychiatry and the Presumption of Expertise Flipping Coins in the Courtroom*, 62 Calif.L.Rev. 693 (1974); *cf. O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).

any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls.[32]

The *McDonald* gloss, however, even with other judicial fine tuning,[33] failed to yield what the District of Columbia Circuit considered a satisfactory result. Consequently, in *United States v. Brawner*,[34] the District of Columbia Circuit, sitting *en banc*, overruled *Durham* and adopted the ALI test. In taking this course, the Court stated, it was responding to three concerns: (1) a perception that the "product rule" led to dominance of the trial by expert witnesses and hindered communication between psychiatrists, attorneys and the jury: (2) a concern for unity of judicial approach and vocabulary in view of the unanimous adoption of the ALI rule by other circuits; and (3) a conviction that it is just to assign criminal responsibility where an individual retains substantial capacity to appreciate the wrongfulness of actions and to exercise his choice.[35] The *Brawner* court, however, retained the *McDonald* definition of mental disease or defect, on the ground that "it has permitted the kind of communication without encroachment, as between experts and juries, that has prompted us to adopt the ALI rule, and hence will help us to realize our objective." [36]

## II.

It is against this background that we now must consider Fredericks' assertion that the Virgin Islands trial court erred in refusing to give to the jury a *McDonald* definition of insanity. The issue facing this Court, twenty years after the adoption by the Virgin Islands Legislature of the "product" rule,

therefore, is what modifications, if any, are appropriate in the jury charge regarding the insanity defense in that jurisdiction.

### A.

The majority in this case concludes that the *Currens* test is not "fundamentally at odds" with the Virgin Islands' statutory definition of insanity, and that therefore its use does not constitute "fundamental error." [37] Such a determination is unfortunately ambiguous, and gives scant guidance to Virgin Islands trial judges in evaluating future requests for jury charges on the insanity defense.

More importantly, to adopt the *Currens* standard in the Virgin Islands runs directly against the grain of the history of the Virgin Islands statute rehearsed above. The *Currens* rule is in essence identical with the ALI formulation that was available to the Virgin Islands Legislature in 1956. Yet, the Legislature eschewed the ALI test and advertently adopted the current wording of the statute that found its roots in the *Durham* "product" rule. Indeed, in the letter which formed the basis for the statutory standard, Judge Biggs expressly rejected the ALI rule, and in preference advocated the "product" rule as the "best formula currently available."

The fact that six years later, in *Currens*, Judge Biggs forsook the "product rule" in favor of a modified ALI test, based in large measure on the shortcomings that had, in the meantime, been detected in the *Durham* Rule, is ineffective to alter the import of the statutory provision. Whatever faults may have been discovered in the "product rule" in the intervening years, and however

---

**32.** 114 U.S.App.D.C. 120, 124, 312 F.2d 847, 851 (1962) (*en banc*).

**33.** The District of Columbia Court had earlier explicated the "product" rule in *Carter v. United States*, 102 U.S.App.D.C. 227, 234–36, 252 F.2d 608, 615–16 (1957) to require "but-for" causation. This refinement, however, did not substantially clarify the product rule. *See also United States v. Washington*, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967) (expert witnesses cannot testify as to what is or is not "disease or

defect," but must describe symptomatology only).

**34.** 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

**35.** *Id.* 153 U.S.App.D.C. at 13–15, 16, 21, 471 F.2d at 981–983, 984, 989.

**36.** *Id.* 153 U.S.App.D.C. at 16, 471 F.2d at 984. *See id.* at 993–994.

**37.** Majority opinion at p. 930.

widely accepted the competing ALI formulation may have become, the courts are not free to set aside the standard which the Virgin Islands Legislature has chosen in favor of one which it specifically rejected. Thus, in my view, the proper jury instruction for the insanity defense must be cast within the framework of the product rule.

A footnote in *Govt. of Virgin Islands v. Bellott*,[38] appears to be the principal basis proffered by the majority as authority for the proposition that the *Currens* standard should now govern. *Bellott*, however, is not persuasive support. In *Bellott*, the defendant challenged a jury instruction which turned on the question whether the defendant bore the burden of demonstrating his sanity. Noting that nothing in *Currens* had cast doubt upon the holding in *Davis v. United States*,[39] that once the burden-of-proof issue was raised, the government bore the burden of establishing sanity beyond reasonable doubt, this Court reversed. In this context Judge Gibbons stated:

> The Court must determine whether there is some evidence . . . *that his act was a consequence of mental illness; if it so finds*, the court must then instruct the jury that the government through the trial has the burden of proving beyond a

reasonable doubt *that the offense was not the consequence of mental illness*.[3]

[3] This must be done in language equivalent to that approved in *United States v. Currens, supra*.[40]

Thus, the holding in *Bellott* simply is that the government bears the burden of proving sanity beyond a reasonable doubt. The reference to *Currens* in a footnote may arguably be read as suggesting that the "product rule" has been superseded in the Virgin Islands. But it is more reasonable to construe the footnote as referring to the fact that in *Currens* this Court *approved* the trial court's jury charge insofar as it

> charged correctly . . . if *Currens* had submitted believable evidence "sufficient to raise a reasonable doubt that he was sane" . . . then the burden was upon the United States to establish beyond reasonable doubt that he was sane and mentally capable of forming the specific criminal intent to commit the crime. . . .[41]

The latter interpretation is supported by the fact that in the underscored portion of the body of the relevant passage of the *Bellott* opinion the Court reiterates the "product" rule.[42]

It was necessary to convene *en banc*, the District of Columbia Circuit felt, in order to supplant the *Durham* standard with the

---

**38.** 495 F.2d 1393 (3d Cir. 1975).

**39.** 160 U.S. 469, 486–88, 16 S.Ct. 353, 40 L.Ed.2d 499 (1895).

**40.** 495 F.2d at 1397. Emphasis added. An examination of the briefs in *Bellott* makes it clear that the Court in that case was in no way called upon to decide that the *Currens* test should be substituted for § 14(4). The only mention of *Currens* in any of the submissions to the Court occurs on page 6 of the appellant's brief, citing that case as support for the proposition that "when some evidence is adduced showing a mental disorder, the burden shifts to the prosecution to prove sanity beyond a reasonable doubt."

It is significant that the briefs of both the appellant and the appellee assume that § 14(4) has not been modified since its adoption in its current form. Indeed, the appellee's supplemental brief noted in passing, at page 5, that § 14(4), as now set forth in the Code, was originally suggested by Hon. John Biggs in 1956.

**41.** 290 F.2d at 775.

**42.** Other indications regarding the intent of the *Bellott* panel are equivocal. In the final section of the opinion, the court rejected the contention that the defendant was entitled to a judgment of acquittal. It noted that "Bellott urges that in a jurisdiction such as the Virgin Islands where *Currens* rather than the *M'Naghten* standard of criminal responsibility applies the rule should be otherwise." This statement may import that the Court assumed that *Currens* was the relevant rule. Such statements are clearly *dicta* however, and in light of the controlling weight to be given to the statute should be read accordingly. *Cf. Govt. of Virgin Islands v. Downey*, 396 F.Supp. 349, 353–54 (D.V.I.1975) (so construing *Bellott*); *Govt. of Virgin Island v. Smith*, 278 F.2d 169 (3d Cir. 1960) ("rule that proof that mental illness was the cause of a criminal act entitled the accused to an acquittal . . . is in force in the Territory of the Virgin Islands").

ALI rule. We should be reluctant to presume that a panel of our Court would discard a considered determination of the Virgin Islands Legislature in an unelaborated footnote.[43]

B.

The Virgin Islands Legislature chose to reject the ALI/*Currens* formulation in favor of the product rule, and no case in this circuit has purported to overrule that choice. Despite this, the majority analyzes the propriety of Fredericks' request for a definition of mental illness divorced from the statutory standard, in the context of an instruction patterned on *Currens.* Such an approach seems *unfounded.* It is the statutory "product rule" which defines the insanity defense in the Virgin Islands, and, whether or not the parties perceived the statute's controlling force, it is against this rule that Fredericks' request must be measured.

Fredericks' primary argument on appeal is that the statutory formula should be modified by the *McDonald* definition of insanity. He suggests that the phrase "mental disease or defect" should be defined to include "any abnormal condition of the mind, regardless of its medical label, which substantially affects mental or emotional processes and substantially impairs behavior controls."[44]

As a matter of logic, Fredericks' contention has considerable merit. If, in ordinary conversation, one were asked whether he thought that an individual's acts evidenced "mental illness," the person questioned would quite legitimately inquire what is meant by "mental illness."

Of course, "when the terms of a statute are 'simple and self-explanatory' its verbatim recitation is sufficient."[45] But the term "mental illness" is neither simple nor self-explanatory.[46]

The psychiatric profession has largely abandoned the term "mental disease," and has replaced it with a catalogue of "mental disorders."[47] Within the profession, a series of identical symptoms will frequently give rise to a diagnosis of different "disorders" depending on the orientation and perceptions of individual psychiatrists.[48] Moreover, the uses to which the term "mental disease" are put within the medical profes-

---

**43.** No discussion whatsoever appears in *Bellott* of any rationale for drastically modifying the *Durham* standard enshrined in the statute.

**44.** Proposed point for charge submitted by Fredericks. In fact, counsel for Fredericks requested the full *Brawner* instruction, combining a *Currens* formulation with the *McDonald* definition of mental disease or defect. The trial judge gave an instruction conflating the *Currens* standard and the Virgin Islands product rule. Under the analysis presented above, such an instruction appears to be incorrect. Since, however, the defendant invited the error and does not challenge that aspect of the charge in the present proceeding, we need not resolve the effect of that particular mistake.

**45.** *Govt. of Virgin Islands v. Carmona,* 422 F.2d 95 (3 Cir. 1970).

**46.** *Cf. Id.* ("unlawful taking of personal property" is not so simple as to obviate the need to charge explicitly on intent to steal.)

**47.** In 1952, the Committee on Nomenclature and Statistics of the American Psychiatric Association, Diagnostic and Statistical Manual; Mental Disorders (1952) explicitly dropped the phrase "mental disease" and replaced it with

"mental disorder," a term used "generically to designate a group of related psychiatric syndromes" ranging from situational neuroses to severe psychosis. *See e. g. Blocker v. United States,* 110 U.S.App.D.C. 41, 47–49, 288 F.2d 853, 859–861 (1961) (*en banc*) (Burger, J. concurring) (collecting authorities to the effect that "mental disease" is not a proper psychiatric term); Fingarette, *The Concept of Mental Disease in Criminal Law Insanity Tests,* 33 U.Chi.L.Rev. 229, 232–234 (1966) (also collecting authorities).

Professor Fingarette's article is a particularly illuminating analysis of the ambiguities in the term "mental disease" as used in the insanity defense.

**48.** *See* Ennís & Litwack, *supra* note 31 (collecting and analyzing authorities; finding "the most common research findings indicate that on the average, one cannot expect to find agreement in more than about 60% of the cases between two psychiatrists"); Reisner & Semmel *Abolishing the Insanity Defense: A Look at the Proposed Federal Criminal Code Reform Act in Light of the Swedish Experience,* 62 Calif.L.Rev. 753, 772–783 (1974) (collecting authorities and analyzing Swedish data).

sion are to a considerable extent tangential to the reasons that a jury would be asked to determine whether a defendant is entitled to an insanity defense. The legal issue is not really whether the defendant is a "latent schizophrenic" or a "paranoid personality," but whether he is capable of entertaining *mens rea*. It would thus appear that when the jury is to be confronted with a series of technical psychiatric diagnoses in an attempt to ascertain the mental status of a defendant, it is appropriate, indeed essential, to define the "mental illness" which is the object of inquiry, rather than risk the tyranny of psychiatric labels.[49]

Such has been the experience of our sister jurisdictions in the administration of the "product rule." As observed above, on the basis of an "eight year experience under *Durham*" the District of Columbia Circuit believed it was necessary to adopt the definition espoused by Fredericks "to make it very clear that neither the court nor the jury is bound by *ad hoc* definitions or conclusions as to what experts state is a disease or defect."[50] More importantly, Maine, the only jurisdiction other than the Virgin Islands which has enacted the product rule by legislation, has construed its statute to be consistent with the *McDonald* definition.[51] Indeed, the courts of Maine have steadfastly looked to the District of Columbia Circuit's construction of the *Durham* rule in setting boundaries for the statutory insanity defense.[52]

Nor is such a refinement at variance with the canons of statutory interpretation. It is elementary that in construing statutes the intent of the legislature is to control.[53] In this case, as outlined above, § 14(4) was adopted from the *Durham* rule, as "the more enlightened view as to the test by which the criminal responsibility of the mentally ill should be measured."[54] It is reasonable to conclude, therefore, that the Virgin Islands Legislature did not intend to freeze the interpretation of the rule in the form it took in 1954, but rather to allow glosses that retain the basic statutory definition as the "enlightened view" evolved.[55]

Moreover, Judge Biggs' influential letter makes clear that the same concerns which led to the enunciation of the *McDonald* definition were present in the promulgation of § 14(4). Thus, Judge Biggs praised the product rule of *Pike* for making clear that the issue of the accused's mental state was a question of fact for the jury.[56] And in drafting his proposed statutory language, he emphasized that "no medical terms are employed and the definition is one of the utmost simplicity and should be easily understood by the laymen comprising the jury."[57] If the lack of judicial guidance led to a situation in which the clash of conflicting professional nomenclature threatened to overwhelm the function of the jury, it appears that the considerations underlying Judge Biggs' suggestions would sanction a jury instruction indicating the proper path of analysis.

**49.** Indeed, the prosecution conceded in oral argument that a definition of "mental illness" would have been "helpful" to the jury.

**50.** 114 U.S.App.D.C. at 124, 312 F.2d at 851.

**51.** *State v. Hathaway,* 161 Me. 255, 211 A.2d 558, 562–64 (1965) (issue is whether "defendant's mental or emotional processes were substantially affected and his behavior controls were substantially impaired; adopting *McDonald*). *See State v. Durgin,* 311 A.2d 266, 267-68 (Me.1973); *State v. Upton,* 362 A.2d 738, 739 (Me.1976).

**52.** *See e. g. State v. Armstrong,* 344 A.2d 42, 51-52 (Me.1975); *State v. Wallace,* 333 A.2d 72, 75–76 (Me.1975); *State v. Durgin,* 311 A.2d 266, 267–68 (Me.1973); *State v. Collins,* 297 A.2d 620, 628 (Me.1972).

**53.** *See Port Construction Co. v. Govt. of Virgin Islands,* 359 F.2d 663 (3d Cir. 1966).

**54.** Revision Note 14 VIC § 14(4).

**55.** *Cf. Williams v. Dowling,* 318 F.2d 642, 643–44 (3d Cir. 1963) (judicial interpretation of progenitor statute in original jurisdiction presumed incorporated into statute if interpretation preceded enactment of second statute), *Caribe Construction Co. v. Penn,* 342 F.2d 964, 967–68 (3d Cir. 1965) (*semble*).

**56.** Biggs' letter, *supra* note 18, p. 5.

**57.** *Id.* p. 11.

This is not to suggest that the instruction requested by the defendant is appropriate for all situations, or that it is required as a general rule. However, where as here the jury is faced with a conflict of psychological diagnoses, put forth in technical terminology, the *McDonald* definition is properly requested to dispel the possibility that the jury will deem the correct medical ascription to control their verdict.

## III.

There remains the issue whether, as the majority believes, the substance of the *McDonald* instruction was conveyed by the charge which, in fact, was given. If such were the case, of course, there would be no cause to order a new trial.

The majority points to two areas of the charge by the trial court in support of its conclusion that the *McDonald* instruction would have been superfluous. First, it notes that the trial judge stated:

> The law provides that a jury shall bring in a verdict of not guilty by way of insanity if at the time of the alleged criminal conduct, the defendant was suffering from a mental illness and that he committed the act charged against him as a consequence of such mental illness. That actually comes right from our Code. That is right in the wording of our Code. The Court has put this another way, that the Defendant shall be entitled to a verdict of not guilty by reason of insanity, if, at the time of the alleged criminal conduct, the Defendant, as a result of mental illness or mental defect, lacked substantial capacity to conform his conduct to the requirements of the law.[58]

It might be argued that, had this been the only instruction on the insanity defense,

the jury would have been adequately apprised of the concept that "mental illness" is an abnormal condition of the mind which substantially impairs behavior controls. However, the trial judge went on to state specifically that under his formulation, the question of "mental illness" and the question of ability to control behavior were separate decisions. Immediately following the above cited portion of the instructions, he stated:

> Now, the burden is on the Government to prove beyond a reasonable doubt either that the Defendant was not suffering from a mental disease or defect, or else that he, nevertheless, had substantial capacity to conform his conduct to the requirements of the law.[59]

It was apparently open to the jury to convict if it found that Fredericks lacked substantial capacity to conform his conduct to law by reason of an abnormal mental condition, but that he was not suffering from a "mental disease or defect."

The impression that the definition of mental illness is not governed by reference to "behavior control" was reinforced by the trial judge's later differentiation of the "step" of finding "mental illness" from the "step" of determining that the criminal act was performed "as a consequence of" the illness.[60] Such a charge, in my view, is not the substantial equivalent of the *McDonald* definition.

Nor did the trial judge's instructions on expert testimony adequately guard against the possibility that the jury might erroneously define "mental illness" in terms of diagnostic categories. The majority refers to the fact that the trial judge instructed the jury:

> did as a consequence or by reason of that mental illness.
> So, you have got three steps.
> One, decide whether he was the actor who did it, two—and part of that step is, if he is guilty of any one of the three charges.
> Two, whether he was mentally ill and three, whether he did what he did as a result or consequence of that mental illness.
> N.T. 389–390. (emphasis supplied)

---

58. N.T. 386, cited at p. 931 of the majority opinion.

59. N.T. 386–387.

60. The charge reads:
   [I]t is for you to decide whether Mr. Fredericks was, at the time, mentally ill. If you so decide, then you *must go one step further* and you are to decide whether he acted as he

You would have to look at all, at the three experts and decide which one to accept, or you may decide to discard all of the experts' opinions and form your own, aside from what the experts said. You may decide it on your own, you are the jurors, it is your responsibility to determine. The experts are there only to help. You may reject their opinion for the reasons that you don't think they had enough facts. You may reject their opinion because you don't believe that their premises are valid. You may reject their opinion because you don't think they have had enough expertise, not enough schooling, they haven't had enough experience. There are all kinds of reasons why you may not accept an expert's opinion. That is why I say you are not bound by the expert's opinion and you may accept or reject their opinions. You are not bound by their definitions, their labels as to what is or what is not a mental illness.[61]

Again, it could be argued that, taken alone, these instructions are sufficient. However, the trial judge prefaced them with the comment that:

> The law does not say that you are bound by those opinions. You may accept their opinions, and in this case you have a difference of opinion, so, it would be very difficult to be bound by them since they vary, they conflict.[62]

One implication a juror could reasonably draw from this latter statement is that medical labels *are* determinative, and it is only the conflict between expert opinions which renders them not binding.[63] The jury could well assume that their task was to choose the "correct" medical diagnosis, which would in turn establish the presence or absence of mental illness. This is particularly true in light of the fact that the trial judge closed his remarks on the subject by stating:

I don't think I need to go into all the ramifications on what is or what is not mental illness. You have had that given to you by the experts and even by the lawyers. As I say, it is your decision.[64]

Such instructions neither clearly convey the substance of the charge which Fredericks properly requested nor perform a function equivalent to the *McDonald* construct.

As this court declared in *Govt. of Virgin Islands v. Carmona*,[65] "A conviction ought not to rest on an equivocal direction to the jury on a basic issue." Here, the fundamental and indeed only question in the trial was the insanity defense. Under these circumstances the definition of "mental disease or defect" is a basic issue, requiring a fully accurate charge.

Accordingly, I respectfully dissent.

## APPENDIX

UNITED STATES COURT OF APPEALS
For the Third Circuit

Chambers of
John Biggs, Jr.                          P.O. Box 230
Chief Judge                      Wilmington 99, Delaware
                                        July 19, 1956

The Honorable Leo P. Miller
Chairman, The Advisory Committee on the
    Revision of the Virgin Islands Code
Charlotte Amalie
St. Thomas, Virgin Islands.

Dear Mr. Miller:

Judge Albert B. Maris wrote me, calling my attention to Title 14, "Crimes", of the Virgin Islands Code, and stating that the staff of the Revision Committee had brought forward subparagraph (4) of Section 14, quoted below, relating to the criminal responsibility of the mentally ill. As you may know, I have devoted some time to a study of this question and Judge Maris

---

**61.** N.T. 388–389. *See* majority opinion p. 931.

**62.** N.T. 388.

**63.** *Cf. Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (negative pregnant instruction was misleading).

**64.** N.T. 370.

**65.** 422 F.2d 95, 99 (1970 3d Cir.), *quoting Bollenbach v. United States,* 326 U.S. 607, 613, 66 S.Ct. 402, 90 L.Ed.2d 350 (1946).

thought that my views might possibly be of some slight assistance. I therefore am writing this letter to you and sending copies to Governor Gordon and to the members of the Committee.

I think that a golden opportunity is presented to the Legislature of the Virgin Islands to take a great forward step—the first in Anglo-American jurisprudence—to create the first modern and workable statute relating to the criminal responsibility of the mentally ill. *It would be historically most interesting if the Virgin Islands should lead the jurisprudence of both the British Commonwealth and of the United States into a new era. That prospect may sound grandiloquent but it might well come to pass.*

The present provision reads as follows: "All persons are capable of committing crimes or offenses except (4) lunatics and insane persons; but a morbid propensity to commit prohibited acts, existing in the mind of a person who is not shown to have been incapable of knowing the wrongfulness of such acts, forms no defense to a prosecution therefor."

You will observe that that portion of subparagraph (4) (Chapter 14, "Crimes") states in effect that even if a person is "insane" or "lunatic" nonetheless he is held to responsibility for his acts unless he is shown not to know the difference between *right* and *wrong*. This of course is the M'Naghten Formula in all of its ancient simple-mindedness. See X Clark & Finnelly 203 (1842); 8 English Reports, Reprint, 720; and also Hansard's Debates, Vol. 67, pp. 288, 714.

Mr. Herbert Wechsler, the reporter for the American Law Institute's Modern Penal Code, has formulated a proposed section, as follows: "Mental Disease or Defect Excluding Responsibility. (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (2) The terms 'mental disease or defect' do not include an abnor-

mality manifested only be repeated criminal or otherwise anti-social conduct."

In a letter to me of June 16, 1956, Mr. Wechsler states: "The theory of our formulation, as you know, is that M'Naghten has two defects that should be remedied: (1) That it takes no account of volitional impairment unaccompanied by intellectual or cognitive disturbances; and (2) That it requires the finding of *total* incapacity—even in the cognitive realm."

Mr. Wechsler also says that the M'Naghten formulation "precisely fits" the cases of some "delusional psychotics". One can imagine cases which the M'Naghten formula fits but only with great difficulty. For example, quivering, quaking imbeciles (perhaps the "idiots" of subparagraph 3 of Title 14 of the Virgin Islands Code) would meet the test of the M'Naghten formula but such persons are not very likely to commit crimes requiring violence and energy.

I do not bring forward the above quoted section of the American Law Institute's proposed Penal Code because I think it presents a correct formula. On the contrary I think it curiously combines the outworn M'Naghten formula with a more modern point of view, the modern point of view being confined to that phrase "or to conform his conduct to the requirements of law." The phrase I have quoted is almost the same as the "product" test referred to in the next paragraph of this letter and thereafter.

The vapid quality of the M'Naghten formula can be well demonstrated by *Hadfield's* case (*Rex v. Hadfield,* 16 State Trials 695 (1800). Hadfield, an old soldier who sustained very severe head wounds at the Battle of Freymar, attempted to assassinate George III because he was of the view that he, Hadfield, like Christ, had to be immolated by public execution so that he might save the world. He tried to kill the King as a sure way of getting himself executed quickly, thus demonstrating that he knew that it was legally wrong to kill a king. Had the M'Naghten formula been in existence at that time it is probable that Hadfield would have been executed. He was

found "not guilty by reason of insanity" by the application of what has become known as the "product" test. I will deal with this test now since I am convinced it is the best formula presently available.

The product test appears in several forms. It was first laid in the United States by the Supreme Court of New Hampshire in *State v. Pike, [State v. Jones]*, 50 N.H. 369, 395 (1871), as a result of the influence of Dr. Isaac Ray on Mr. Justice Doe of the Supreme Court of that State. (See the famous "Musical Correspondence", the Doe-Ray Letters).

In the *Pike [Jones]* case, Pike, described as a dipsomaniac by his counsel, killed Thomas Brown with an ax in the course of a robbery. Justice Doe sat with Chief Justice Perley in the trial of this case. The defense was insanity. The Chief Justice charged the jury that "if . . . [the jury] found that the defendant killed Brown in a manner that would be criminal and unlawful if the defendant were sane— the verdict should be 'not guilty by reason of insanity' if the killing was the offspring or *product* of mental disease in the defendant; that neither delusion nor knowledge of right and wrong, nor design or cunning in planning and executing the killing and escaping or avoiding detection, nor ability to recognize acquaintances, or to labor or transact business or manage affairs, is, as a matter of law, a test of mental disease; but that all symptoms and all tests of mental disease are purely matters of fact to be determined by the jury." (Emphasis added).

You will note—and this is most important—that the issue of the accused's mental state was a question of *fact* for the jury; in other words, whether Pike possessed the capacity to entertain criminal intent, or *mens rea*, was a question of fact. The M'Naghten formula supplies a legal, but not a factual, test. This is its weakness. The New Hampshire rule correctly supplies a test of fact.

In the dissenting opinion in *United States ex rel. Smith v. Baldi*, 192 F.2d 540 (3 Cir. 1951), the dissenting judges (Biggs, McLaughlin and Staley) adopted the Scotch test and stated as follows: "The Scottish test of irresponsibility was expressed by Lord Justice-Clerk Inglis in 1963, as follows: 'In a strictly legal sense, there is no insane criminal. Concede insanity and the homicidal act is not criminal. The act of the insane, which in the sane would be criminal, lack every element of crime.' The Scotch rule remains substantially the same today. It is true that the word 'insane' is not a precise term but the meaning of the Scotch rule is clear despite this. We can see no reason why the legal test of irresponsibility for the commission of a crime should not be based upon the principle that if the mental illness of the accused is the proximate, or a contributory cause of the crime, then the accused may not be found guilty of murder. With this finding, as an inevitable corollary, would go the commitment of an accused in Pennsylvania under the Pennsylvania Mental Health Act of 1923, as amended, to an appropriate institution." *Id. supra* at pp. 568–9. See also note 64, cited to the text, as follows: "As quoted by MacNiven, 'Mental Abnormality and Crime', in Chapter II, 'Psychoses and Criminal Responsibility', MacMillan and Co., Ltd., at p. 60." You will see that this test is substantially the same as the *State v. Pike [State v. Jones]* test.

The case of *Durham v. United States* [94 U.S.App.D.C. 228], 214 F.2d 862 (1954), also adopted the product test. This is the famous decision by Judge Bazelon in the United States Court of Appeals for the District of Columbia Circuit. It has aroused wider discussion than any case since M'Naghten's. It should be noted that a petition for rehearing before the court en banc was filed and was denied. It represents the law in the District of Columbia. Judge Bazelon said: "By its misleading emphasis on the cognitive, the right-wrong test requires court and jury to rely upon what is, scientifically speaking, inadequate, and most often, invalid and irrelevant testimony in determining criminal responsibility.

"The fundamental objection to the right-wrong test, however, is not that criminal irresponsibility is made to test upon an inadequate, invalid or indeterminable symptom or manifestation, but that it is made to rest upon *any* particular symptom. In attempting to define insanity in terms of a symptom, the courts have assumed an impossible role, not merely one for which they have no special competence. . . . [It] is dangerous 'to abstract particular mental faculties, and to lay it down that unless these particular faculties are destroyed or gravely impaired, an accused person, whatever the nature of his mental disease, must be held to be criminally responsible. . .' In this field of law as in others, the fact finder should be free to consider all information advanced by relevant scientific disciplines."

Judge Bazelon said further, quoting from the report of the Royal Commission: "The sufferer from [melancholia, for example] experiences a change of mood which alters the whole of his existence. He may believe, for instance, that a future of such degradation and misery awaits both him and his family that death for all is a less dreadful alternative. Even the thought that the acts he contemplates are murder and suicide pales into insignificance in contrast with what he otherwise expects. The criminal act, in such circumstances, may be the reverse of impulsive. It may be coolly and carefully prepared; yet it is still the act of a madman. This is merely an illustration; similar states of mind are likely to lie behind the criminal act when murders are committed by persons suffering from schizophrenia or paranoid psychoses due to disease of the brain."

Judge Bazelon stated the guiding principle of law as follows: "The rule we now hold must be applied on the retrial of this case and in future cases is not unlike that followed by the New Hampshire court since 1870. It is simply that an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect.

"We use 'disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use 'defect' in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual effect of a physical or mental disease.

"Whenever there is 'some evidence' that the accused suffered from a diseased or defective mental condition at the time the unlawful act was committed, the trial court must provide the jury with guides for determining whether the accused can be held criminally responsible. We do not, and indeed could not formulate an instruction which would be either appropriate or binding in all cases. But under the rule now announced, any instruction should in some way convey to the jury the sense and substance of the following: If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case."

All of the foregoing relates to decisional law and you need a statute. A few years ago a Committee of The Group for the Advancement of Psychiatry, for which Mr. Thomas D. McBride, now Chancellor of the

Philadelphia Bar Association, and I acted as consultants, after many months of work and many conferences, recommended a legislative enactment in the following terms:

"Section I. *Definition of mental illness:*

'Mental Illness' shall mean an illness which so lessens the capacity of a person to use (maintain) his judgment, discretion and control in the conduct of his affairs and social relations as to warrant his commitment to a mental institution.

Section II. *When mental illness is a defense:*

No person may be convicted of any criminal charge when at the time he committed the act with which he is charged he was suffering with mental illness as defined by this Act, and in consequence thereof, he committed the act.

Section III. When the defendant is acquitted on the defense of mental illness, such a finding shall be recorded as part of the verdict.

Section IV. When such a verdict is recorded, the Court shall immediately commit the defendant to a public institution for the custody, care and treatment of cases of the class to which the defendant belongs, and the defendant shall not be discharged therefrom unless and until the Court has adjudicated that he has regained his capacity for judgment, discretion and control of his affairs and social relations."

You will observe that no medical terms are employed and the definition is one of the utmost simplicity and should be easily understood by the laymen comprising the jury.*

The GAP Committee, I might add, comprised four well known psychiatrists, all

members of high standing in the American Psychiatric Society, the Chairman being Dr. Philip Q. Roche, one of the Pennsylvania State alienists.

I am taking the liberty of sending to Governor Gordon and to the distinguished members of your Committee a copy of "The Guilty Mind", recently published by Harcourt, Brace & Company, and I think that you and the members of the Committee might find Chapters IV, V, and the first part of Chapter VI (pp. 81 to 161 inclusive) of some interest on this subject. I am also taking the liberty of sending the following articles: "Some Observations on the Case of the *United States ex rel. Smith v. Baldi*", Proceedings of the American Philosophical Society, Vol. 98, No. 4, August 6, 1954; "Criminal Responsibility and Psychiatric Expert Testimony", Group for the Advancement of Psychiatry; and a reprint of an article from the Temple Law Quarterly "Procedures for Handling the Mentally-Ill Offender in Some European Countries" which, while it does not bear precisely upon the questions presented to you, nonetheless demonstrates the liberal approach of some of the advanced European countries to the general problem.

I doubt if anything contained in either the book or the article will be news to Governor Gordon because of his wide knowledge and experience in the fields of psychology and penology.

The adherence by most of the courts in the United States and of the British Commonwealth to the out-worn M'Naghten formula presents great danger to the body politic. As you know, quite frequently the psychotic criminal works his way up the ladder of crime, commencing with the smaller offenses, such as larceny or simple

---

* It is taken from the first sentence of Section 102(11) of the Pennsylvania Mental Health Act of June 12, 1951, P.L. 533, 50 Purdon's Pennsylvania Statutes Annotated Section 1072(11), with minor variations.

Section 102(11) reads in toto as follows: " 'Mental illness' shall mean an illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or advisable

for him to be under care. The term shall include 'insanity', 'unsoundness of mind', 'lunacy', 'mental disease', 'mental disorder', and all other types of mental cases, but the term shall not include 'mental deficiency', 'epilepsy', 'inebriety', or 'senility', unless mental illness is superimposed."

In the minds of the GAP Committee and its consultants, the last sentence quoted presented unnecessary complications and it was therefore omitted.

assault. He is tried and condemned for these offenses as if he were an ordinary criminal simply because he knows the difference between "right" and "wrong" under the M'Naghten formula. He emerges from prison untreated and uncured and frequently goes on to more serious crimes such as rape or murder. The M'Naghten formula should be cast aside and psychotic criminals should be confined in institutions for the criminally insane for treatment and cure, if cure be possible. Otherwise, incarceration must be permanent.

That is what the GAP statute, heretofore quoted, is intended to effect and what I think it would accomplish.

I must apologize for the length of this letter.

*It seems to me that the Virgin Islands, Legislature has a God-given opportunity to lend the jurisprudence of America and England out of the moress into which it has fallen in the field of the criminal responsibility of the mentally ill. I consider this matter to be of such prime importance that I would readily come to the Virgin Islands to discuss it with you and the members of your Committee. if that would be of any assistance.*

Cordially yours,

John Biggs, Jr.

August 1, 1956

Honorable John Biggs, Jr.
U.S. Court of Appeals
2070 U.S. Court House
Philadelphia, Pennsylvania

Dear Judge Biggs,

I have delayed answering your letter of the 19th, regarding a substitute for McNaghten rule in the new Virgin Islands Code, until we could study the materials you enclosed.

We have incorporated in our draft, for the consideration of the Advisory Committee next week, the changes suggested by Judge Maris in his letter of July 25th to Mr. Leon P. Miller, Chairman of the Committee.

We are grateful for your kindness in bringing this important and constructive suggestion to our attention.

With kindest regards,

Respectfully,

Equity Publishing Corporation

Meldrim Thomson, Jr.
President

MT/ld

CC: Honorable Albert B. Maris
Honorable Leon P. Miller

Washington, D.C.

July 25, 1956

Honorable Leon P. Miller
United States Attorney
Charlotte Amalie, Virgin Islands

Dear Mr. Miller:

Referring to Judge Biggs' letter of July 19th to you regarding the McNaghten rule now embedded in section 14(4) of title 14, I would strongly urge the modification of that subsection along the lines which he advocates. I am completely convinced that the McNaghten rule is unsound and that it does not promote the public interest. It is far safer, I am sure, to commit an insane defendant to an appropriate mental institution at the outset of his criminal career than to imprison him for a short term upon the theory that he knew right from wrong and then release him to renew his criminal career.

I suggest that section 14 of title 14 be amended to read (as to paragraph 4) as follows:

"§ 14. Capacity to commit crimes or offenses.

All persons are capable of committing crimes or offenses except:

.     .     .     .     .

(4) persons who are mentally ill and who committed the act charged against them in consequence of such mental illness; and . . ."

If this change is made it will be necessary to change section 3637 of title 5, so that it would read as follows:

§ 3637. Mental illness of the defendant

If the defense is the mental illness of the defendant, the jury shall be instructed, if they find him not guilty on that ground, to state that fact in their verdict, and the court shall thereupon commit the defendant to a suitable public institution for custody, care and treatment from which he shall not be discharged until the court is satisfied that he has regained his capacity for judgment, discretion and control of the conduct of his affairs and social relations.

Sincerely yours,

/s/ Albert B. Maris

cc: Hon. John Biggs, Jr.
    Mr. Meldrim Thomson